# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| POWER PROBE GROUP, INC.,        ) <br><br> Plaintiff,     ) <br> vs.     ) <br><br> INNOVA ELECTRONICS, CORP.     ) <br><br> Defendant.     ) | Case No.: 2:21-cv-00332-GMN-EJY <br><br> **ORDER GRANTING PRELIMINARY INJUNCTION** |

Pending before the Court is Plaintiff Power Probe Group Inc.'s Motion for Preliminary Injunction, (ECF No. 36). Defendant Innova Electronics Corporation filed a Response, (ECF No. 54), to which Plaintiff filed a Reply, (ECF No. 57).

For the reasons discussed below, the Court **GRANTS** Plaintiff's Motion for Preliminary Injunction.

## I.   BACKGROUND

This case arises from Defendant's alleged infringement of United States Patent No. 7,184,899 ("the '899 Patent"). (Compl. ¶ 14). The '899 Patent teaches an "Energizable Electrical Test Device For Measuring Current and Resistance of an Electrical Circuit." (*See* '899 Patent, Ex. 1 to Compl., ECF No. 1-2). Defendant offers a competing product for sale, the Innova PowerCheck #5420 (the "Accused Product"). Plaintiff alleges that the Accused Product practices at least each limitation of Claim One of the '899 Patent. (*See generally* Mot. Prelim. Inj. ("Mot. PI"), ECF No. 36); (Product Page – Innova PowerCheck, Ex. 5 to Decl. Christian JJ Paredis, Ph.D ("Paredis Decl."), Ex. A to Mot. PI, ECF No. 37-5).

Following briefing, the Court conducted a two-day hearing on Plaintiff's Motion for Preliminary Injunction. (*See* Mins. Proceedings, ECF Nos. 93, 95). Based on the parties'

briefing and testimony, this Court denied the motion for failing to raise serious questions on the merits that the Accused Product performs "measurement of a plurality of parameters." (Order Denying P.I., ECF No. 101).  To prove a likelihood of success on the merits, Plaintiff must prove that the Accused Product measures continuity in addition to voltage. (*Id.* 9:18–23). Because this Court found that the Accused Product merely *detects* continuity, the Court determined that the Accused Product did not *measure* continuity. (*Id.* 9:18–10:2).

On appeal, the Federal Circuit concluded that that the District Court "erred in construing 'continuity' as a parameter that is not measurable," and vacated and remanded for further proceedings regarding whether Plaintiff met the requirements for a preliminary injunction. (Fed. Cir. Op. at 5, ECF No. 141).  Following instruction from the Court on remand, the parties filed supplemental briefing. (*See* ECF Nos. 153, 154).

## II.    <u>LEGAL STANDARD</u>

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, (2008).  Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. "[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (internal quotation marks omitted).  The Ninth Circuit has held that "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (internal quotation marks omitted).

///

//

### III.   <u>DISCUSSION</u>

"Courts have the power to grant injunctions to prevent the violation of patent rights." *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1372 (Fed. Cir. 2005) (citing 35 U.S.C. § 283 (2000)).  "In considering whether to grant a preliminary injunction, a court must consider whether the patent owner has shown: (1) a reasonable likelihood of success on the merits; (2) the prospect of irreparable harm to the patent owner; (3) the balance of hardships tips in its favor; and (4) granting the injunction would not adversely affect the public interest." *Id.*  Before the Court can determine the patent holder's likelihood of success on the merits, the Court must first make preliminary decisions on relevant disputed terms.  Then, the Court will determine whether Plaintiff has sufficiently shown the four preliminary injunction factors.

#### A. Preliminary Claim Construction

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citations and internal quotation marks omitted).  The interpretation of the scope and meaning of disputed terms in patent claims is a question of law and exclusively within the province of a court to decide. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  When construing disputed claim terms, the Court must give each disputed term "the meaning that the term would have to a person of ordinary skill in the art at the time of the invention," unless the patentee clearly intended a different definition. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005).  Furthermore, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears but in the context of the entire patent, including the specification." *Id.* at 1313.

In certain cases, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases

involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. In other instances, the claim term may have a particular meaning in the field of art that is not immediately clear. *Id.* In such cases, the Federal Circuit has instructed that a court's analysis should focus on the intrinsic evidence, including "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Id.* Specifically, differences between the claims often provide useful guidance in understanding the meaning of the claim terms. *Id.* "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314–15.

The claims, however, are not read in isolation; rather, the Court must read claims in light of the entire specification of which the claims are a part. *Id.* In fact, the specification is "the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Courts also look to the prosecution history as part of the intrinsic record to determine how the Patent Office and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. The prosecution history, however, is less useful for claim construction purposes because it lacks the clarity of the specification. *Id.*

Finally, extrinsic evidence may also be relevant to claim construction. *Id.* Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995). Although such evidence may aid the Court in construing claim terms, "it is unlikely to result in a reliable interpretation of patent

1    claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at

2    1319.  Thus, "while extrinsic evidence can shed useful light on the relevant art, . . . it is less

3    significant than the intrinsic record in determining the legally operative meaning of claim

4    language." *Id.* at 1317 (internal quotation marks omitted).

5    Claim constructions determined at the preliminary injunction stage are not the law of the

6    case and may be changed at a later stage of the proceedings. *Guttman, Inc. v. Kopykake Enters.*,

7    302 F.3d 1352, 1361 (Fed. Cir. 2002) (explaining that "district courts may engage in a rolling

8    claim construction" at the preliminary injunction stage); *Purdue Pharma L.P. v. Boehringer*

9    *Ingelheim GmbH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001) ("[F]indings of fact and conclusions of

10   law at the preliminary injunction stage are subject to change.").  With these rules of law in

11   mind, the Court will now construe disputed claim terms, giving each term the meaning that it

12   would have to a person of ordinary skill in the art ("POSITA") when the product was invented,

13   unless the patentee clearly intended a different definition. *See Phillips*, 415 F.3d at 1312–13.

### 1. Multimeter Functionality

15   The first term the parties dispute is "multimeter functionality," which is required in

16   claim one's preamble.  A "multimeter" is a particular device that can measure multiple

17   electrical properties.  Defendant argues that "multimeter functionality" connotes the ability to

18   measure a plurality of parameters, not just voltage. (Resp. 9:5–7, ECF No. 54).  Specifically,

19   Defendant interprets this term to refer to the ability to measure parameters including voltage,

20   continuity, and at least one other parameter. (*Id.* 10:2–10:10).  Defendant's expert, Mr.

21   Andrews, testified that while it is possible that a device called a multimeter in 2005 would

22   measure voltage only, and detect continuity, those devices were more commonly called a

23   "VOM." (Day I Hr'g Tr. 77:25–78:10, ECF No. 99).  He stated that more frequently, a

24   multimeter measures current, voltage, and resistance because they are all related through Ohms

1    Law. (*Id.* 78:11–19).  Defendant also reviewed the functionalities of the '899 Patent to argue

2    that it embodies all three measurements: voltage, resistance, and current. (*Id.* 92:8–18).

3         Defendant then claims that Plaintiff "clearly disavowed" a broad meaning allowing

4    multimeter functionality to encompass devices measuring only voltage and continuity. (Resp.

5    10:14–11:4).  In support of Plaintiff's alleged disavowal, Defendant claims that Plaintiff, during

6    prosecution, stated that multimeter functionality "includes the function of a traditional

7    multimeter plus 'loaded impedance, wave forms and current drain, and also that the electrical

8    test could simultaneously measure current and voltage of the electrical system under test.'" (*Id.*

9    10:6–9).  Defendant notes that the Examiner included the multimeter functionality limitation in

10   its Reasons for Allowance. (*Id.*).  Defendant also claims that according to the "electrical

11   industry, technical dictionaries, and PP itself," a multimeter is defined as measuring volts,

12   ohms, and amps. (*Id.* 10:9–13).

13        Plaintiff argues that "multimeter functionality" is the ability to measure at least two

14   parameters. (Reply 8:24–25); (Day I Hr'g Tr. 49:1–50:5).  Plaintiff relies on a definition

15   provided by Fluke, an industry leader, who defines a multimeter as a "test tool used to measure

16   two or more electrical values." (Day I Hr'g Tr. 42:19–24).  Plaintiff insists that it did not

17   disavow a broad definition but merely explained that "the electrical test device includes the

18   capability to characterize load impedance, wave forms and current drain." (Reply 9:18–22).

19   Just because an embodiment of the patent included the capability does not mean that the claims

20   disavowed a broader meaning, particularly where the Federal Circuit has held the plain

21   meaning of "plurality" (a related term in the claim that modifies the parameters for which the

22   multimeter enables measurement) is "two or more." (*Id.* 9:22–10:8).  While Defendant argues

23   that the Examiner's inclusion of "multimeter functionality" in the "reason for allowance"

24   supports disavowal, the Federal Circuit has held that such a conclusion would be in error. (*Id.*

25   10:5–8) (quoting *Salazar v. P&G Co.*, 414 F.3d 1342, 1343 (Fed. Cir. 2005) ("[T]he district

court erred in using the patent examiner's Reasons of Allowance to [narrow] the scope of the claim term[.]").

Likewise, Plaintiff argues that Defendant conflates "multimeter" (a device) with "multimeter functionality," (a device's ability to measure parameters) in attempting to limit the scope of the claim limitations. (*Id.* 9:1–11). While a multimeter can measure a variety of parameters, a device need not have the full capabilities of a multimeter to undertake functions commonly performed by a multimeter. (*Id.*). Plaintiff argues that Defendant's own website supports this interpretation because Defendant sells multimeters separately from "electrical testers" that perform functions included within multimeters. (*Id.* 9:12–17). Hence, electrical testers can have multimeter functionality without performing all the functions of a multimeter. In the hearing, Plaintiff also referred to a patent application that Defendant was listed as an applicant for, which teaches that a multimeter measures two parameters. (Day I Hr'g Tr. 59:8–60:12).

Given this Court's earlier construction that a plurality of parameters means "at least two," the context indicates that the plain and ordinary meaning of having "multimeter functionality . . . for selective measurement of a plurality of parameters" likely includes any device that can perform multimeter functions that enable measurement of at least two parameters. Even accepting the testimony of Mr. Andrews that a multimeter would commonly measure three parameters, the context of the language in the preamble persuades the Court to find that "multimeter functionality" does not *require* all three measurements. If "multimeter functionality" required the device to perform the tasks of a multimeter, then the patent would claim "a multimeter" rather than a device with "multimeter functionality." Additionally, even if a POSITA at the time of the '899 Patent would call a device that measures voltage and detects continuity a "VOM," this Court finds *infra* that the Accused Device *measures* both voltage and continuity. The Court further agrees with Plaintiff that Plaintiff did not disavow its

1   argument by providing an example of multimeter functionality in its brief.  Therefore, the Court

2   construes a device having "multimeter functionality" to be a device with the functionality of a

3   multimeter that measures two or more parameters, such as voltage and continuity.

### 2.  Input Signal

5         Limitations one and three refer to an "input signal" provided to the electrical system.

6   Defendant maintains that the Accused Product does not apply an input signal because battery

7   voltage applied by a probe is not an input signal. (Resp. 15:8–13).  It argues that that the

8   Accused Product does not provide a digital pulse train or signal but rather provides only current

9   to power the electrical system. (*Id.*).  Defendant's expert explained that an input signal is used

10  to perform measurement, and it is "not just a current or a voltage." (Day 1 Hr'g. Tr. 113:24–

11  114:17; 117:3–10).  He stated that an input signal must be a separate signal that will create a

12  current, and this signal current will be different than the current used to power the device. (*Id.*

13  124:23–125:2).

14        In its briefing, Defendant primarily relies on a prior art reference.  Defendant argues that

15  a prior patent Plaintiff licensed, U.S. Patent No. 5,367,250 disclosed and claimed, "a portable,

16  hand-held instrument particularly adapted to performing voltage and continuity tests on

17  electrical systems of autos, trucks, and similar vehicles, that could determine continuity in both

18  an unpowered state and a powered state." (Resp. 11:17–20).  Defendant argues that Plaintiff

19  "expressly incorporated the continuity testing and power supply features of the '250 patent into

20  the '899 patent." (*Id.* 11:20–21).  Defendant then argues, without supporting evidence, that the

21  '899 patent "went further" by using the term "input signal" to refer "to a separate, manipulable

22  signal, such as the 'input signal' generated by the logic probe generator and detector 109,"

23  which it argues "is consistent with the '899 patent's stated goal of providing a test device that

24  combines the conventional features of the old PP device with new programmable diagnostic

25  functionalities." *(Id.* 11:22–12:4).

1    Plaintiff argues that input signals can include both current and voltage. (Reply 4:1–5:6).

2   Plaintiff explains that a POSITA would understand input signal to include providing power to

3   the electrical system under test, which is controlling unless either (1) the patent sets out an

4   express definition of the term; or (2) the patentee expressly disavowed the full scope of the

5   claim term during prosecution. (Reply 4:13–19) (citing *Thorner v. Sony Comput. Entm't Am.*

6   *LLC*, 669 F.3d 1362, 1365–66 (Fed. Cir. 2012)).  Plaintiff cites a number of cases indicating

7   that input signal can include voltage and current. (Ex. A to Reply, ECF No. 58) (providing

8   cases indicating that "input signal" has an apparent meaning in the art).  Plaintiff also highlights

9   that Defendant's argument that the claim refers to a "separate, manipulable signal . . . generated

10  by the logic probe generator and detector" takes the patent out of context because it seeks to

11  import one preferred embodiment to limit the claims. (Reply 4:24–5:1) (quoting ('899 Patent

12  4:18–20) (explaining that the claim limitation indicates "Preferably, the voltage regulated

13  output is provided independent of any input signal to the electrical system under test.")).

14  Plaintiff also points out that Defendant's own expert, when discussing a prior art reference,

15  provides testimony that current is an input signal. (*Id.* 5:2–5).

16    As taught by the patent and the ordinary meaning in the art, "input signal" may refer to

17  voltage and/or current.  The patent does not provide an express definition, and Plaintiff did not

18  disavow the full scope of the claim term during prosecution, so the understanding of a POSITA

19  controls here.  Additionally, Defendant's prior art reference argument is not supported by

20  intrinsic evidence that the improvement of the '899 Patent over the '250 Patent has any

21  influence over the meaning of "input signal" in the '899 patent.  Plaintiff provided sufficient

22  testimony and evidence for the Court to conclude that the current provided to power the

23  electrical system is sufficient to constitute an "input signal" in the Accused Product.  For

24  purposes of the infringement analysis below, the Court further agrees with Plaintiff that the

25

Accused Product infringes on the claims relating to "input signal" because the probe element provides current to the electrical system.

### 3. During Measurement of the Parameters

Defendant next argues that requiring energization of the probe "during the measurement of parameters" indicates that a patented device must simultaneously measure at least two parameters. (Resp. 13:11–14:1).  But Defendant improperly relies on the Examiner's reason for allowance to impute the limitation. (*Id.*); *Salazar v. P&G Co.*, 414 F.3d 1342, 1343 (Fed. Cir. 2005) ("the district court erred in using the patent examiner's Reasons of Allowance to [narrow] the scope of the claim term").  Plaintiff argues that the claimed invention must measure at least two parameters, but it need not do so simultaneously. (Pl.'s Reply 10:21–12:2).  Nothing in the language requires that the parameters be measured simultaneously, only that the device is capable of measuring more than one parameter during the time the electrical system under test receives energy from the probe.  The Court adopts Plaintiff's interpretation.

### 4. Current Sourcing

The Preamble of the Patent describes a device that provides "current sourcing" to an electrical system under test.  Defendant argues that the Accused Product provides "voltage sourcing," which is not "current sourcing." (Resp. 17:4–8); (Spangler Decl. ¶ 44, Ex. 3 to Resp.).  Defendant claims that because it uses a selectable voltage switch to provide voltage to the electrical system under test, the relevant input signal is voltage, not current. (*Id.*).  At the hearing, Defendant's expert Dr. Spangler, testified that the device contains a switch that can be pushed to activate electricity at the probe tip, which allows current to flow out of the probe tip into the device. (Day I Hr'g Tr. 109:17–21).  On cross, Dr. Spangler stated that current sourcing does not require a current to be fixed in the context of the '899 Patent, contrary to Defendant's earlier briefing. (*Id.* 110:14–111:23).

1   Plaintiff's expert Dr. Paredis rebuts the argument that "current sourcing" would imply an

2   independent current because the '899 Patent does not contemplate an entirely separate electrical

3   circuit. (Paredis Decl. ¶ 39, Ex. C to Reply, ECF No. 60).  He claims that the '899 Patent

4   teaches a single power supply, which supplies all of the device's energy. (*Id.* ¶  43).  He further

5   states that to a POSITA, the term "current sourcing" refers to "using electrical sources that

6   cause currents to flow, allowing the rate of flow to change with the load." (*Id.* ¶ 39).  While the

7   voltage regulated output deals with "outputting" voltage for the device to use internally, current

8   sourcing refers to current being delivered to the system under test, such as to a taillight or fan

9   motor. (*Id.* ¶ ¶ 47-48).  So, even though they both draw power from the same power supply, the

10  terms operate differently in the '899 Patent.  Because the Court understands that both current

11  and voltage provide an electrical input signal and does not see a separate electrical circuit

12  requirement in the '899 Patent, the Court adopts Plaintiff's construction.

13          **5.  Processor**

14          Limitation three requires "a processor electrically connected to the probe element and

15  configured to manipulate the input signal provided to the electrical system and receive an

16  output signal in response to the input signal . . . ."  Plaintiff argues that the Accused Product's

17  "Range Selector" includes a processor, and that Defendant attempts to limit the term

18  "processor" to a "microprocessor." (Reply 7:17–24).  The Range Selector, it argues, has

19  circuitry, and a processor can include one or more integrated circuits. (*Id.* 7:17–8:1). Plaintiff

20  points out that Defendant concedes that the Range Selector manipulates current. (*Id.*).

21          Plaintiff's expert explained that a processor "is responsible for taking the inputs from the

22  user and converting that into the signals that then can be provided to the device being test

23  through the probe." (Day I Hr'g Tr. 136:4–6).  Based on the switches that provide input, the

24  processor will route different currents through the probe. (*Id.* 136:14–18).  A processor is

25

broader than a microprocessor, which is only part of the circuitry that performs logic. (*Id.* 138:2–9; 159:12–18).

Defendant replies that the Accused Product does not manipulate current through the probe; rather, the microprocessor reads the voltage and presents it on the LED. (Resp. 15:13–16). Defendant's expert opined that he did not see a processor performing a regulation function in an analog processing step. (Day I Hr'g Tr. 153:22–154:6). Defendant further claims that the voltage on the probe tip is manually operated by the Range Selector, a switch, not by a processor or integrated circuit. (Resp. 15:17–19). After considering both parties' briefing and the expert testimony, the Court agrees with Plaintiff's interpretation that the range selector includes a processor as understood by a POSITA, which manipulates voltage and includes a microprocessor.

### B. Likelihood of Success on the Merits

To demonstrate a likelihood of success on the merits, Plaintiff must show that (1) its infringement claim will likely withstand Defendant's challenges to the validity of the '899 Patent, and (2) it will likely prove that Defendant infringes on the '899 Patent. *See Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997). If Defendant raises a "substantial question" about the validity, enforceability, or infringement, the Court should not issue a preliminary injunction. *Id.*

#### 1. Validity

A patent enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation. *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998). When an alleged infringer attacks the validity of a patent at the preliminary injunction stage, the burden is on the challenger to produce evidence if invalidity. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377, 1379 (Fed. Cir. 2009). The patentee has the burden of responding with contrary evidence. *Id.* The trial court

1   must weigh evidence both for and against validity, and if it concludes there is a "substantial

2   question" regarding the patent's validity, "meaning that the alleged infringer has presented an

3   invalidity defense that the patentee has not shown lacks substantial merit, it necessarily follows

4   that the patentee has not succeeded in showing it is likely to succeed at trial on the merits of the

5   validity issue." *Id.* (citing *New England Braiding Co. Inc. v. A.W. Chesterson Co.*, 970 F.2d

6   878, 883 (Fed. Cir. 1992).

7       Defendant raises three challenges to the validity of the '899 Patent: (1) the '899 Patent is

8   anticipated by a prior art reference under 35 U.S.C. § 102 (2002); (2) the '899 Patent is obvious

9   based on the prior art under 35 U.S.C. § 103; and (3) the '899 Patent is indefinite because the

10  phrase "plurality of parameters" in claim one is ambiguous under 35 U.S.C. § 112.

### a.  Anticipation

12      Defendant's first invalidity argument is that the '899 Patent is anticipated by prior art.

13  Its primary argument focuses on the Korean Patent No. 20040052093 ("the '093 Reference"),

14  although Defendant also moved to supplement its disclosures to include another, allegedly

15  anticipatory Korean reference, Korean Patent No. 20030306499 ("499 Reference"). (*See* Mot.

16  Leave File Amend, ECF No. 68).  The Magistrate Judge granted Defendant's motion to

17  supplement, so the Court will address both References in turn. (*See* Order Granting Motion,

18  ECF No. 125).

19      Under the pre-AIA version of the Patent Act, a patent filed before March 2013 is invalid

20  as anticipated by the prior art if either "the invention was known or used by others in this

21  country, or patented or described in a printed publication in this or a foreign country, *before* the

22  *invention* thereof by the applicant for patent," 35 U.S.C. § 102(a) (2002) (emphasis added); or

23  "the invention was patented or described in a printed publication in this or a foreign country or

24  in public use or on sale in this country, more than *one year prior* to the date of the *application*

25  *for patent* in the United States," 35 U.S.C. § 102(b) (2002) (emphasis added).  Anticipation

requires disclosure of each and every claim limitation in a single prior art reference, either explicitly or inherently. *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999).  An anticipation analysis requires a comparison of the construed claim to the prior art. *Helifix, Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000).

### i.   '93 Reference

To find anticipation in this case, step one of the analysis requires a foreign printed publication to describe the '093 Reference either (1) before the invention of the device claimed by the '899 Patent or (2) more than one year before the '899 Patent Application in January 5, 2005.  The parties do not dispute that for purposes of § 102, the effective date of the '093 Reference is June 19, 2004. (*See* Day II AM Transcript 35:16–17).  Therefore, the '093 Reference was not published more than one year prior to the '899 Patent Application under § 102(b).  So, if the '093 Reference is anticipatory, it must be anticipatory under § 102(a).  To be anticipatory, the Reference must have been published before the '899 invention (reduction to practice) date.

Plaintiff, employing the "swear behind" doctrine, argues that it reduced the invention to practice in April 2004.  A patentee can generally swear behind their reduction to practice date if they can show sworn testimony and corroborating evidence that a prototype of the patented invention could perform each limitation of the at-issue patent claim and work for its intended purpose. *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986); *Correge v. Murphy*, 705 F.2d 1326, 1329 (Fed. Cir. 1983); *Intellect Wireless, Inc. v. HTC Corp.*, 910 F. Supp. 2d 1056, 1059 (N.D. Ill. 2012), aff'd, 732 F.3d 1339 (Fed. Cir. 2013).  The invention need not be commercially satisfactory when reduced to practice; performing at a stage where people would risk commercialization of the invention is sufficient. *Scott v. Finney*, 34 F.3d 1058, 1061 (Fed. Cir. 1994); *Goodrich v. Harmsen*, 442 F.2d 377, 383 (C.C.P.A. 1971).  "The sufficiency of the proffered corroboration is determined by a 'rule of reason'

1    analysis in which all pertinent evidence is examined." *Apator Miitors ApS v. Kamstrup A/S*, 887

2    F.3d 1293, 1295 (Fed. Cir. 2018).

3        Plaintiff and its expert Mr. Hoover presented evidence contained in SolidWorks

4    computer design software and corroborating testimony that allow this Court to recognize April

5    2004 as the date the '899 Patent was invented for purposes of § 102(a).  The evidence

6    demonstrates that a design capable of manufacture existed in March 2003, and source code last

7    modified on April 20, 2004, indicates that a prototype running the code would be fully

8    functional and practice each element of claim one.  Mr. Hoover testified that the models created

9    around March 2003 had sufficient detail for him to state with a high level of probability that

10   they would have been ready for mass production at that time. (Day II AM Hr'g Tr., 40:10–16,

11   ECF No. 98).  He further opined that the model would have been operational by April 20, 2004.

12   (*Id.* 48:16–20).

13       Additionally, the name of the file containing the source code, "P33._1-06.HEX," likely

14   indicates that a prototype was tested at least seven times prior to the creation of the file.

15   Assuming "the first version of the PP3 file was likely named '1-00,' each subsequent version

16   representing a modification thereto, which would have been preceded by a round of testing of

17   the power Probe Prototype." (*See* Ex. D to Plaintiffs' Reply, Hoover Decl. ¶¶ 105–112, ECF

18   No. 61).  Plaintiff further provides corroborating testimony from former employees saying that

19   the patented invention was successfully tested in April of 2004. (*Id.* ¶¶ 77–97, 113–116).  For

20   example, Mr. Wittwer states in his declaration that he witnessed a successful test of the device

21   in April 2004. (*See* Day II AM Hr'g Tr., 50:12–18).

22       Defendant's response in the hearing does not dissuade the Court from accepting

23   Plaintiff's swear-behind date.  On cross-examination, Mr. Hoover stated that none of the

24   asserted claims were directed to the housing, and housing without a circuit board and

25   programming for the processor wouldn't work. (*Id.* 53:16–24).  When asked whether he had

seen any test reports from 2005, Hoover replied "no," and that it was beyond the scope of his work in this case. (*Id.* 54:21–55:2). He further stated that he had not run the hexadecimal code on a circuit test or seen documents confirming dual continuity testing working in 2004. (*Id.* 56:6–11, 60:50–61:2). On redirect, however, Mr. Hoover maintained that there was a high degree of probability that a plurality of parameters were measured by the prototype that he observed in the documents and confirmed were tested via source code file. (*Id.* 70:5–14).

Defendant next called Dr. Spangler to the stand, who testified that one needs a detailed schematic to know whether a prototype works, which Mr. Hoover did not have. (*Id.* 79:9–80:18). He opined that Plaintiff lacked evidence of photographs, exemplar parts, test results, or a bill of materials to prove that a prototype was made that embodied the elements of the '899 Patent. (*Id.* 82:8–14).

Defendant also argues that Plaintiff did not properly disclose its reduction to practice evidence under LPR 1-7(b). (Mot. Strike 11:23–12:5, ECF No. 69). Plaintiff vigorously refutes this accusation. (Resp. Mot. Strike 19:1–8, ECF No. 78) ("Power Probe responds to this accusation by producing the service email, download link, the documents served, and LPR 1-7(e) disclosure, proving conclusively that those documents were in-fact produced on June 4, 2021, along with their metadata. Further, each of these is supported by declaration testimony.") It appears that Plaintiff properly disclosed its reduction to practice evidence.

After reviewing the evidence and hearing transcripts, the Court finds that Plaintiff has likely reduced the invention to practice before the '093 Reference would have been prior art, and Defendant therefore has not raised a substantial question that the '093 Reference anticipates the '899 Patent. Even if the Court did not accept Plaintiff's swear-behind date, the anticipation claim would still fail at step two of the analysis because the '093 and '499 References do not appear to contain each and every claim limitation disclosed in the '899 Patent, as is discussed below.

*i.* *'499 Reference*

Defendant moved to supplement its disclosures to include a new anticipatory Korean reference ("499 Reference") based on the same KR application 2002-0079821 filed December 13, 2002. (*See generally* Mot. Leave File Amend). The Magistrate Judge granted Defendant's Motion after the preliminary injunction hearing, so it was not discussed in the hearing. (*See* Order Granting Mot. Leave File Amend, ECF No. 125). The '499 Reference is substantially identical to the '093 Reference, with the only notable difference being that the '499 Reference's earlier publication date is March 8, 2003. (Mot. Leave File Amend, 2:6–11). Because the '499 Reference was published before the April 2004 '899 Patent Reduction to Practice Date for § 102(a), and more than one year before the '899 Patent Application Date in January 2005, the Court must analyze whether the '499 Reference discloses each claim limitation of claim one.

Defendant's motion to supplement its disclosures includes a claims comparison chart, in which it alleges that the '499 Reference discloses each and every element of the '899 Patent. (*See* Ex. A to Mot. Leave File Amend 18:18–27:15). Plaintiff replied that its expert had not been granted the opportunity to evaluate the '499 Reference but opined that if the '499 Reference was substantially identical to the '093 Reference as Defendant claims, it could demonstrate through expert testimony that the '499 Reference did not disclose every element of the '899 Patent. (Resp. Mot. Leave File Amend 21:5–18, ECF No. 79).

Plaintiff argues that according to its expert Dr. Paredis, the '093 Reference, and therefore the '499 Reference, does not disclose (1) selective measurement of a plurality of parameters, (2) provision of an input signal in the unpowered state where there is no current sourcing, (3) a processor connected to the probe and configured to manipulate the input signal in the unpowered state with no current sources, and (4) selective powering of the electrical system during measurement of the parameters because in all three modes, the '93 Reference discloses *either* selective powering *or* measurement. (*Id.* 10:25–21:4) (emphasis added). Dr.

Paredis testified that according to the '093 Patent instruction manual, a user can *either* measure the voltage *or* power the device but cannot do both simultaneously. (Day II AM Hr'g Tr., 18:1–14) (emphasis added). A key characteristic of the '899 Patent is that a user can do both simultaneously. (*Id.*). Dr. Paredis further explained, and Defendant's expert did not convincingly refute, that the '093 Reference detects continuity, but does not measure it. (*Id.* 26:10–15; 28:14–31:16). Because anticipation requires disclosure of each and every claim limitation either explicitly or implicitly, the Court concludes that at this state in the litigation, there is no substantial question concerning anticipation of the '899 Patent.

### b. Obviousness

Defendant argues that "Claim 1 and its dependent claims are made obvious in light of the '093 Reference in combination with Payman or Hamblin or PP II device in combination with one or more of PP II Instruction Manual, PP ECT and/or Advertisement." (Resp. 20:5–7). Given that Defendant's argument depends on the '093 Reference, and the anticipation analysis concludes that the '093 Reference likely does not qualify as prior art, Defendant's obviousness argument fails.

### c. Indefiniteness

A patent is indefinite if its claims, in light of the specification and prosecution history, fail to inform POSITAs about the scope of invention with reasonable certainty. 35 U.S.C. § 112; *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). The definiteness requirement must acknowledge the inherent limitations of language. *Id.* at 909. On the one hand, some modicum of uncertainty is the "price of ensuring the appropriate incentives for innovation." *Id.* (citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002)). On the other hand, courts should bear in mind that patents are addressed to those skilled in the relevant art. *Nautilus*, 572 U.S. at 909. "At the same time, a patent must be precise enough to afford clear notice of what is claimed," informing the public of what is still

available to them in a manner that avoids a "zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims." *Id.* at 909–10 (citing *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942)).

Defendant's indefiniteness argument is directed at the preamble, but also implicates the third and fourth limitations of claim one. Defendant posits that the phrase "plurality of parameters" in the preamble is indefinite. (Resp. 20:7–9). To explain its argument, Defendant incorporates only paragraphs 86–90 of the Andrews Declaration and its Invalidity Charts. And only paragraph 89 of the Andrews Declaration takes issue with the '899 Patent's use of "plurality of parameters." (*See* Andrews Decl. ¶ 89, Ex. 8 to Resp., ECF No. 54-8). But Andrews' argument concerns claim one's use of "the parameter" in limitation four, not the "plurality of parameters" phrase in the preamble. (*Id.*). Andrews explains that claim one includes a limitation requiring "a display device electrically connected to the processor and configured to display a reading of the output signal, the reading being representative of the parameter." (*Id.*). Andrews argues that because the preamble references "a plurality of parameters," the claim's use of "the parameter" in association with the display "has no antecedent basis." (*Id.*). And a POSITA would not be able to determine which of the parameters is "the parameter" that would be displayed. (*Id.*).

Plaintiff similarly replies by incorporating paragraphs 202–206 of the Paredis Declaration, (Ex. C to Reply), rather than providing an argument in its brief. (*See* Reply 17:14–19 n.26). Paredis explains that "the parameter" is not indefinite because it is clear in light of the preceding claim limitation. (Paredis Decl. ¶ 205). The preceding claim limitation references "the output signal being representative of at least one of the parameters." (*Id.*). Therefore, "the parameter" as used in limitation four references "one of the parameters" as measured in the preceding limitation. (*Id.*).

The Court agrees with Plaintiff that "plurality of parameters" and "the parameter" are not indefinite. Limitation three indicates that "the parameter" displayed as indicated in limitation four is the output signal received from the probe. Defendant has not explained what zone of uncertainty exists based on the use of the disputed terms and has therefore failed to raise a substantial question as to indefiniteness.

### 2. Infringement

To establish a likelihood of success on the merits for its claim of patent infringement, a plaintiff must show it is likely that a trier of fact would find the patent-in-suit is valid and infringed. *See Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1370 (Fed. Cir. 2005). Patent infringement will be found when a product practices each limitation of one of the patent's claims. *ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1080 (Fed. Cir. 2003). To prove a likelihood of success on the merits, a patentee must prove that success in establishing infringement is "more likely than not." *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 525–26 (Fed. Cir. 2012). Here, Plaintiff has shown that Defendant's device more likely than not infringes the '899 Patent.

### a. Preamble

Claim one's preamble, which this Court has construed as a limitation, requires "an electrical test device having multimeter functionality and being adapted to provide current sourcing to an electrical system for selective measurement of a plurality of parameters thereof in at least one of powered and unpowered states, the electrical test device comprising. . . ." (899 Patent, Ex. 1 to Compl.). This Court has already construed the following terms: "multimeter functionality," "current sourcing," "measurement," and "plurality of parameters." (*See supra*); (*See* Order Denying P.I). Applying that claim construction to Plaintiff's infringement claims, Plaintiff has shown that the Accused Device "more likely than not" infringes on Plaintiff's patent if the Accused Device measures continuity.

In the previous Order denying Plaintiff's Motion for Preliminary Injunction, the Court found that the Accused Product measured voltage only and merely detected continuity. (*See* Order Denying P.I 11:8–18). The Court relied on Fluke, an industry leader in multimeters, and Dr. Spangler's testimony that the existence of continuity is a "yes or no answer." (*See id.* 10:3–9); (Day II PM Hr'g Tr. 23:22–24:5). Because continuity is not a parameter often measured, Dr. Spangler explained that a device detecting continuity will indicate its presence with a light. *Id.*; (*See also* Spangler Decl. ¶ 26, Ex. 3 to Resp.) ("Continuity is not a parameter that has a measured value assigned to it and is thus not a 'measured parameter.'") Persuaded that continuity could be detected but not measured, the Court further found that Plaintiff did not explain how the Accused Product measured continuity. (*See* Order Denying P.I 10:11–13). Thus, the Court denied Plaintiff's Motion for Preliminary Injunction. (*Id.* 11:19–22).

Plaintiff appealed, and the Federal Circuit determined that this Court erred in its preliminary claim construction because the '899 Patent lists continuity as one of the "parameters measurable by the electrical test device." (Fed. Cir. Op. at 3). The Circuit further pointed to dependent claims ten and twelve of the '899 Patent, which provide further support for the idea that "the inventor used the term continuity as a measurable quantity." (*Id.* at 6). Claim ten includes a limitation "wherein the parameters measurable by the test device," include continuity. (*Id.* at 3). Claim twelve includes "a pair of signal lamps connected to the processor and configured to illuminate in response to continuity measurement." (*Id.*). Although claim three uses the phrase, "detecting continuity," the Federal Circuit found that the detection and measurement of continuity are not mutually exclusive. (*Id.* at 6).

In its supplemental briefing following the Federal Circuit's decision, Plaintiff explains how the Accused Device measures continuity. Plaintiff's primary argument is that the Accused Product's internal measurement of continuity satisfies claim one of the '899 Patent. (Pl.'s Supp. Brief 4:1–20, ECF No. 153). "Measurement" requires "numerical or quantitative value," so it

1   logically follows that a device's mere detection of continuity does not provide a measurement.

2   (Order Denying P.I 8:5–8).  However, in light of the Federal Circuit's holding that continuity is

3   measurable, the Court agrees with Plaintiff that the Accused Device's internal measurements

4   provide more than mere detection.  Although early circuit testers detected continuity without

5   the determination of a numerical value, those rudimentary devices do not use a processor of the

6   type contained in both devices here. (*See* Pl.'s Supp. Brief n.4); (*See* Spangler Decl. ¶¶ 34–35,

7   Ex. 3 to Resp.).  It is undisputed, and this Court has already noted, that internal measurements

8   taking place in the Accused Device act as a condition precedent for the illumination of the LED

9   display lights. (Order Denying P.I 8:13–22).

10          According to Plaintiff's expert Dr. Paredis, continuity is measured through the internal

11  quantification done in the analog-to-digital converter when the Accused Product is in

12  Continuity Mode. (Paredis Decl. 27:12–19, Ex. C to Reply).  To determine continuity, the

13  converter measures voltage and then compares the measurement to the reference voltage. (*Id.*).

14  If the measured voltage exceeds the reference amount, continuity is shown as being detected on

15  the device. (*Id.*).  At this point, although the number portrayed on the LCD screen reading is in

16  voltage, the voltage reading is used to represent continuity. (*Id.* at 34:3–9).  Unlike the process

17  for measuring the voltage parameter, to measure continuity the user of the device must connect

18  it to a component and insert a current. (Day II PM Hr'g Tr. 16:11–22).  Dr. Paredis further

19  demonstrated that the Accused Product measures the parameters while the probe powers the

20  electrical system under test, which is another limitation of the preamble. (*Id.* 17:8–20).

21          Defendant argues that even if continuity can be measured, this Court's "findings of non-

22  infringement remain undisturbed." (Def.'s Supp. Brief, 4:16–17, ECF No. 154).  Defendant

23  suggests that Plaintiff has asked this Court to count the voltage measurement twice: once to

24  represent voltage, and once to represent continuity. (*Id.* 3:6–9).  Defendant's expert attempts to

25  differentiate "detect" from "measure" by arguing that a "device that measures a parameter

provides an output that is quantified or numerical in nature" as opposed to an output that indicates the condition is either detected or not detected. (Spangler Decl. ¶ 27, Ex. 3 to Resp.). But internal measurements must be taken to create any version of an output, LED light or numerical display. Defendant's supplemental briefing does not refute Plaintiff's claims that its analog-to-digital converter compares voltage measurements as a way of determining continuity when the device is in Continuity Mode. And Defendant's expert does not explain why "[u]sing the voltmeter functionality" . . . "to evaluate continuity does not demonstrate the ability to measure a second parameter." (*Id.* ¶ 31). If the device takes internal measurements and compares them to a threshold value in order to alert the user of the device about the continuity level, it appears that voltage measurements can be used to measure continuity.

Even if resistance is the preferred method to measure continuity, and a measurement of current is required for Ohm's Law, the Court finds it is more likely than not that the Accused Product measures continuity. Both devices use an analog-to-digital converter to convert signals to be displayed on an LCD screen. (Spangler Decl. ¶ 35, Ex. 3 to Resp.); (Paredis Decl. ¶ 105, Ex. C to Reply). Both devices measure continuity based on different thresholds and compare a measurement to the threshold value. (Spangler Decl. ¶ 302, Ex. 3 to Resp.); (Paredis Decl. ¶ 111, Ex. C to Reply). Plaintiff's expert concluded that the Accused Product measures continuity in the way that most multimeters do, with the only difference being that other multi-meters display a resistance measurement instead of the Accused Product's display of voltage measured across a reference resistor. (Paredis Decl. ¶ 112, Ex. C to Reply). The Court concurs, and therefore finds that the Accused Product measures continuity.

### a. Limitations 1 through 5

Plaintiff has also demonstrated it is "more likely than not" that the rest of claim one's limitations are practiced by the Accused Product. Beginning with limitation one, the parties' disagreement focuses on the construction of "input signal." (*See* Reply 4:1–5:6); (Resp. 15:8–

13).  Because the Court has construed input signal to include voltage, *supra*, the Accused Product likely practices the first limitation.

The parties' next dispute pertains to limitation three and concerns the terms "processor," which is construed above, and "output signal."  Plaintiff argues that the Accused Product receives an output signal because it supplies voltage (input signal) through the probe, and then measures voltage and current in response. (Reply 8:2–7).  Defendant replies that when the Accused Product supplies voltage at the probe element, it does not measure a parameter of the electrical system. (Resp. 16:12–17:3).  The Accused Product likely practices the third limitation because it receives an output signal in response to providing voltage to the electrical system under test (input signal).

The Court further determines that the Accused Product likely practices limitation four because the Accused Product's LCD display shows a reading of voltage, and the LED lights are illuminated to represent the parameter of continuity.  Finally, Plaintiff sufficiently demonstrated that the Accused Product allows measurement simultaneously with powering, which means that the Accused Product also practices limitation five.  Therefore, Plaintiff has proved that success in establishing infringement is "more likely than not."

**C. Irreparable Harm**

The party seeking emergency relief "must make a clear showing that it is at risk of irreparable harm, which entails showing a likelihood of substantial and immediate irreparable injury." *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (citing *Winter*, 555 U.S. at 22).  Thus, to satisfy the irreparable harm factor in a patent infringement suit, a patentee must establish that (1) absent an injunction, it will suffer irreparable harm, and (2) a sufficiently strong causal nexus relates the alleged harm to the alleged infringement. *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012).

1      Plaintiff advances multiple theories in support of its claim to irreparable harm: loss of

2  market share, price erosion, lost business opportunities, good will, and reputation as an

3  innovator and market leader, lost demand for non-flagship products, forced layoffs, and

4  unwillingness to license. (Mot. PI 9:18–16:23).  Plaintiff argues that in instances of two

5  products competing in a market during the pendency of litigation, the result is almost also

6  damage to the patentee's market share and profitability. (*Id.* 9:19–22).  Plaintiff also claims that

7  under Federal Circuit precedent, it is clear error to find no irreparable harm when the parties

8  compete directly and the plaintiff is losing market share and customers. (*Id.* 10:5–8).

9      In response, Defendant asserts that Plaintiff has not met its burden to show irreparable

10  harm and impliedly argues that all of Plaintiff's claims to irreparable harm assume that the

11  parties are competing in a two-player market. (Resp. 21:2–10).  Defendant then identifies other

12  competitors selling comparable products in the market. (*Id.*) (citing Constable Decl., Ex. 13 to

13  Resp., ECF No. 54-14); (Product Comparison Chart, Ex. 15 to Resp., ECF No. 55-16);

14  (Amazon Listing for Circuit Testers, Ex. 16 to Resp., ECF No. 55-17).

15      Plaintiff has met its burden to show likely irreparable harm because Plaintiff's theories

16  do not depend on the existence of a two-player market.  A two-or-fewer player market supports

17  irreparable harm but is not necessary to show irreparable harm. *See Robert Bosch LLC v. Pylon*

18  *Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011).  Plaintiff's other contentions—loss of

19  market share, loss of follow-on purchases, price erosion, harm to goodwill, harm to reputation,

20  and workforce reduction from resulting competition—also support a finding of irreparable

21  harm. *See Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296 (Fed. Cir. 2013) (loss of

22  market share, price erosion, harm to goodwill and reputational harm); *see also AstraZeneca LP*

23  *v. Apotex, Inc.*, 633 F.3d 1042 (Fed. Cir. 2010) (workforce reduction); *Celsis In Vitro, Inc. v.*

24  *CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (price erosion); *Sanofi-Synthelabo v.*

25  *Apotex, Inc.*, 470 F.3d 1368 (Fed. Cir. 2006) (price erosion, loss of goodwill, workforce

reduction); *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159 (Fed. Cir. 2014) (loss of market share, workforce reduction).

Moreover, Plaintiff has provided supporting evidence to substantiate its other theories. (Riera Decl. ¶ 42, Ex. B to Mot. PI, ECF No. 38); (Poindexter Rep. 7:18–23, 13:11–15, 14:1–15:5, Ex. C to Mot. PI, ECF No. 39) (direct competition); (Riera Decl. ¶¶ 30–37) (workforce reduction and price erosion); (Riera Decl. ¶ 40, 51) (lost growth, expansion, new partnerships); (Poindexter Rep. 8:3–7) (lost goodwill); (Poindexter Rep. 11:1–4); (Riera Decl. ¶¶ 6–7) (loss of demand for other products); (Riera Decl. ¶¶ 12–23) (unwillingness to license).  Even though the consequences of direct competition, price erosion, and market erosion are calculable in damages, the ability to quantify the damage is not a sufficient reason to deny a preliminary injunction. *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1304 (Fed. Cir. 2013).

Defendant's argument that there is a robust market for (non-infringing) circuit testers is wholly unpersuasive.  Even if there were other *infringing* competitors than Defendant, that would not be a sufficient reason to deny the injunction either. *Id.* at 1305; *Robert Bosch LLC*, 659 F.3d at 1150–52; *Pfizer*, 429 F.3d at 1381.

The sole remaining question is whether Plaintiff has demonstrated a causal nexus between the infringement and alleged irreparable harm.  If a patent encompasses just one of a small number of features of the patented device, the plaintiff must show a causal nexus between the infringed features and irreparable harm. *Apple Inc.*, 695 F.3d at 1374–75.  Here, however, Plaintiff's patent encompasses the entire product at issue, not merely a feature, and Plaintiff's evidence that it will likely suffer irreparable harm absent an injunction demonstrates the requisite causal nexus.

### D.  Balance of Hardships

To satisfy the third factor, the patentee must show that the balance of hardships weighs in its favor. *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 645 (Fed. Cir. 2015).  This factor

evaluates the effect on the parties of a grant or denial of an injunction. *Id.*  The balance of hardships here favors Plaintiff.  Plaintiff's circuit testers comprise 70% of its business. (Riera Decl. ¶¶ 4, 8, 15).  Plaintiff invested over $2 million in circuit tester R&D, which it is recouping through sales. (*Id.* ¶¶ 9–10).  Allowing the infringing product to remain on the market, at a substantially lower price than Plaintiff's circuit testers, would cause irreparable harms.

Defendant has only been offering the accused product for sale since November 2020. (Addendum D to Poindexter Rep., ECF No. 39-4).  Defendant offers fifty other products, none of which are allegedly infringing, indicating that an injunction would not substantially harm their business. (Poindexter Rep. 12:5–16).  Defendant vaguely argues that a "sweeping injunction" would prohibit all "discussions with current or potential customers" and any act vaguely "inducing infringement." (Resp. 22:21–23:10).  Defendant does not explain how an injunction narrowly tailored to the Accused Product would be so sweeping or affect its business.

Given the centrality of the patented invention to Plaintiff's business, the harm of denying an injunction far outweighs the hardship Defendant would face if an injunction issues. Plaintiff would not receive the benefits of being able to recoup its investments that a limited period of exclusive rights provides, it would face the prospect of dramatically reducing its workforce, and it would lose a substantial market for its products.  Defendant would not face corollary harms of the same magnitude.  Therefore, the balance of hardships favors Plaintiff.

///

///

///

///

///

### E. Public Interest

The fourth factor requires a showing that "the public interest would not be disserved by a permanent injunction." *Apple Inc.*, 809 F.3d at 646.  Generally, the public interest weighs in favor of securing patent rights. *See Hybritech v. Abbott Laboratories*, 849 F.2d 1446, 1458 (Fed. Cir. 1988).  But the public interest may best be served by allowing infringement if the patent concerns some essential product like life-saving pharmaceuticals. *See Sanofi-Synthelabo*, 470 F.3d at 1383–84.  Here, there is no essential public interest in securing a broader market for the patented device than Plaintiff is able to provide, and the public interest therefore weighs in Plaintiff's favor.

Accordingly, Plaintiff successfully demonstrates that all *Winter* factors weigh in its favor, and the Court GRANTS Plaintiff's request for a preliminary injunction.

### F. Bond

Under the Federal Rules, "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c).  Neither party specified a bond amount in their initial motion or briefs, in the two-day hearing, or in the supplemental briefing.  Accordingly, the Court ORDERS that the preliminary injunction shall not issue or be effective until the posting of a bond by Power Probe Group Inc. in the amount of $100.00.

## IV.   <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Preliminary Injunction, (ECF No. 36), is **GRANTED**.

**IT IS FURTHER ORDERED** that Innova Electronics Corporation is hereby enjoined, pending a final determination on the merits, from promoting, marketing, advertising, selling, and offering, for sale the Innova PowerCheck #5420 (the "Accused Device").

**IT IS FURTHER ORDERED** that the preliminary injunction issued herein shall be effective upon the posting of a bond by Power Probe Group Inc. in the amount of $100.00.

**IT IS FURTHER ORDERED** that a Markman Hearing is set for January 24 and 25, 2024, at 9:00 AM in LV Courtroom 7D before Judge Gloria M. Navarro.  A Tutorial Hearing is set for January 17, 2024 at 9:00 AM in LV Courtroom 7D before Judge Gloria M. Navarro.

**DATED** this _____ day of October, 2023.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT