# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| POWER PROBE GROUP, INC., | |
| Plaintiff, | Case No.: 2:21-cv-00332-GMN-EJY |
| vs. | |
| INNOVA ELECTRONICS CORPORATION, | **CLAIM CONSTRUCTION ORDER** |
| Defendants. | |

Pending before the Court are the proposed claim constructions submitted by Plaintiff Power Probe Group, Inc. and Defendant Innova Electronics Corporation.  Plaintiff filed an Opening Claim Construction Brief, (ECF No. 107), to which Defendant filed a Response, (ECF No. 115), and Plaintiff filed a Reply, (ECF No. 116).  The Court held a Tutorial Hearing on October 14, 2025, (*See* Minutes, ECF No. 278), and a *Markman* Claim Construction Hearing on October 15, 2025, (*See* Minutes, ECF No. 280).  Subsequently, the Court permitted the parties to file supplemental claim construction briefing. (*See* Minutes, ECF No. 280). Thereafter, Plaintiff and Defendant filed Supplemental Briefs, (ECF No. 283, ECF No. 284, respectively).

This is an Order construing the disputed terms of the claims in United States Patent No. 7,184,899 ("the '899 Patent").  The parties originally submitted seventeen terms and phrases for construction. (*See generally* Opening Br. 4–22, ECF No. 107; Resp. Br. 9–23, ECF No. 115).  The parties now agree on the construction for seven of those terms, (*see* ECF No. 279), which the Court adopts.  This leaves ten disputed claim terms for this Court to construe.

After consideration of the briefs and material submitted by the parties, the arguments of counsel at the claim construction hearing, and the record before the Court, the Court issues this Order construing the disputed claim terms.

1

## I.     BACKGROUND

The '899 Patent is directed to an electrical test device which is adapted to provide power to and perform multiple measurements upon an electrical system. (*See* '899 Patent 1:19–20, ECF No. 1-2).[1]  In response to a need in the art for a sophisticated electrical test device which could test increasingly complex electrical systems in the powered state, Plaintiff filed a patent application that eventually issued as the '899 Patent. (*See id.* 1:23–43).  In its "broadest sense," the '899 Patent teaches an electrical test device comprised of "a conductive probe element, a power supply, a processor and a display device." (*Id.* 2:22–24).

This case arises from Innova's alleged infringement of the '899 Patent. (*See* First Amended Compl. ¶ 55, ("FAC"), ECF No. 139).  Innova offers a competing product for sale, the Innova PowerCheck #5420 ("the Accused Product"), which PowerProbe alleges practices at least Claims 1, 4-10, 12 and 13 of the '899 Patent. (*Id.*).  Prior to submitting briefing on claim construction, PowerProbe filed a Motion for Preliminary Injunction, (ECF No. 36), which this Court denied. (*See* Order Denying Prelim. Inj., ECF No. 101).  PowerProbe appealed to the Federal Circuit, which vacated this Court's order and remanded for further proceedings. (*See* Fed. Cir. Vac. at 2, ECF No. 141).  Thereafter, this Court granted PowerProbe's Motion for Preliminary Injunction, (*see* Order Granting Prelim. Inj., ECF No. 204), and Innova then appealed. (*See* ECF No. 209).  The Federal Circuit affirmed this Court's Order Granting Preliminary Injunction, and these proceedings followed. (*See* Fed. Cir. Op. at 2, ECF No. 257).

In its orders denying and granting PowerProbe's Motion for Preliminary Injunction, this Court preliminarily construed some of the disputed claim terms. (*See, e.g.*, Order Granting Prelim. Inj. 5:14–12:11).  These preliminary constructions are referenced below in the discussion of their respective claim terms.

---

[1] This citation indicates the patent column and lines in which the cited portion appears.  For example, this citation corresponds to column 1, lines 19–20.

1

## II.    **LEGAL STANDARD**

The resolution of patent infringement actions proceeds in two steps.  First, the Court must engage in a claim construction analysis to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996).  Second, once the claims have been properly construed, the factfinder "compar[es] the properly construed claims to the device accused of infringing" to determine whether the accused device practices all the limitations of one or more claims. *Id.*  In this Order, the Court engages only in the first step.

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citations and internal quotation marks omitted).  The interpretation of the scope and meaning of disputed terms in patent claims is a "question of law, to be determined by the court." *Markman*, 517 U.S. at 384.  When construing disputed claim terms, the Court must give each disputed term "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313.  However, this plain and ordinary meaning may be displaced when the patentee "sets out a definition and acts as his own lexicographer," or "when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  Importantly, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.

In certain cases, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly

understood words." *Id.* at 1314. In other instances, the claim term may have a particular

meaning in the art that is not entirely clear. *Id.* In such cases, the Federal Circuit has instructed

that a court's analysis should focus on the intrinsic evidence, including "the words of the claims

themselves, the remainder of the specification, the prosecution history, and extrinsic evidence

concerning relevant scientific principles, the meaning of technical terms, and the state of the

art." *Id.* "[T]he claims themselves provide substantial guidance as to the meaning of particular

claim terms." *Id.* In addition to the claim in which the disputed term appears, other "claims of

the patent in question, both asserted and unasserted, can also be valuable sources of

enlightenment as to the meaning of a claim term." *Id.* Specifically, differences between the

claims often provide useful guidance in understanding the meaning of the claim terms. *Id.* For

example, the presence of a dependent claim that adds a particular limitation gives rise to a

presumption that the limitation in question is not present in the independent claim." *Id.* at

1314–15.

The claims are not read in isolation, but in light of the entire specification, of which the

claims are a part. *Id.* at 1315. Indeed, the specification is "the single best guide to the meaning

of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

However, courts must take care to "avoid the danger of reading limitations from the

specification into the claim[s]." *Phillips*, 415 F.3d at 1323 (citing *Comark Commc'ns, Inc. v.

Harris Corp.*, 156 F.3d 1182, 1186–87 (Fed. Cir. 1998) ("[T]here is sometimes a fine line

between reading a claim in light of the specification and reading a limitation into the claim

from the specification.")). For example, "although the specification often describes very

specific embodiments of the invention," the claims must not be construed as confined to those

embodiments. *Phillips*, 415 F.3d at 1323. Courts may also consider the prosecution history,

which "consists of the complete record of the proceedings before the [Patent and Trademark

Office] and includes the prior art cited during examination of the patent." *Id.* at 1317.

However, the prosecution history lacks the clarity of the specification and is often less useful for claim construction purposes. *Id.*

Finally, extrinsic evidence may also be relevant to claim construction. *Id.* "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Although such evidence may aid the Court in construing claim terms, "it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319. Thus, "while extrinsic evidence can shed useful light on the relevant art, . . . it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317 (internal quotation marks omitted).

## III.    THE LEVEL OF ORDINARY SKILL

"[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 13113. Thus, before engaging in claim construction, the Court must first determine the level of ordinary skill in the relevant technology. In making this determination, the Court considers the complexity of the technology, the pace of technological advancement in the field, and the education and experience of those working in the area. *See Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

Here, both parties agree that the appropriate level of skill is a bachelor's degree in electrical engineering (or an equivalent degree in a suitable engineering discipline) and at least two years of academic or industry experience with electrical systems. (*See* Decl. of Christiaan Paredis ⁋ 69, ECF No. 37; Decl. of Scott Andrews ⁋ 40, Ex. 9 to Resp. Mot. Prelim. Inj., ECF No. 54-9).

/ / /

/ / /

## IV.    <u>CONSTRUCTION OF THE TERMS ON WHICH THE PARTIES AGREE</u>

Prior to the October 15, 2025, *Markman* hearing, the parties submitted a Notice of Agreement to Narrow Disputed Terms and Adopt Certain Agreed-Upon Claim Constructions, (ECF No. 279). In that Agreement, the parties provided stipulated constructions for seven previously disputed claim terms. (*See generally* Agrmnt Narrow Disp. Terms, ECF No. 279). The Court recites each of those terms below and hereby adopts the agreed-upon constructions:

### A.    "provide current sourcing"

The parties agree that "provide current sourcing" should be construed as "supply current." (Agrmnt Narrow Disp. Terms 1:22). This term appears in Claims 1, 11, 16, and 22. ('899 Patent 11:30, 12:26, 12:64, 13:54). The Court hereby adopts this agreed-upon construction.

### B.    "output signal"

The parties have agreed that "output signal" should be construed as "an electrical signal received from the electrical system." (Agreement Narrow Disputed Terms 2:7–8). This term appears in Claims 1, 11, 16, 22, 25, and 27. ('899 Patent 11:41–46, 12:36–41, 13:11–16, 14:14–19; 14:40–50). The Court hereby adopts this construction.

### C.    "selective powering"

The parties have agreed that "selective powering" should be construed as "user-controlled powering." (Agreement Narrow Disputed Terms 2:13). This term appears in Claims 1, 11, 16, and 22. ('899 Patent 11:49, 12:44–45, 13:19, 14:22–23). The Court hereby adopts this construction.

### D.    "energization of the probe element during measurement of the parameters"

The parties have agreed that this term requires no construction. (Agreement Narrow Disputed Terms 2:14–16). This term appears in Claims 11 and 22. ('899 Patent 12:45–47, 14:24–26). The Court agrees that this term requires no construction, as it does not contain the

kind of "terse language" that a jury cannot understand without further explanation. *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005).  The terms "measurement" and "parameters" are construed below, (*see* Section (V)(C)(3)(ii–iii)), and the Court finds that "energization" and "probe element" would be clearly understood by a person of ordinary skill in the art ("POSITA").  Thus, the Court determines that this term requires no construction.

### E. "measurement of the parameters during powering of the electrical system"

The parties have agreed that this term requires no construction. (Agreement Narrow Disputed Terms 2:17–19).  This term appears in Claim 2. ('899 Patent 11:55–56).  Again, this Court agrees.  "Measurement" and "parameters" are construed below, and the terms "powering" and "electrical system" would be clearly understood by a POSITA and require no further explanation for the jury to understand. *Terlep*, 418 F.3d at 1382.  Thus, the Court determines that this term requires no construction.

### F. "measurement of the parameters without powering of the electrical system"

The parties have agreed that this term requires no construction. (Agreement Narrow Disputed Terms 2:20–22).  This term appears in Claim 2. ('899 Patent 11:59–59).  For the same reasons as stated above, this Court agrees and determines that this term requires no construction.

### G. "wherein the parameters measurable"

The parties have agreed that this term requires no construction. (Agreement Narrow Disputed Terms 2:23–24).  This term appears in Claims 10 and 21. ('899 Patent 12:21–22, 13:49–50).  Again, because "measurement" and "parameters" are construed by this Court below, the Court agrees with the parties and determines that this term requires no construction.

/ / /

/ / /

/ / /

1    **V.    CONSTRUCTION OF THE DISPUTED TERMS**

2        The parties have identified ten disputed claim terms for construction: (1) "An electrical

3    test device having multimeter functionality"; (2) "for selective measurement of a plurality of

4    parameters" (3) "in at least one of powered and unpowered states"; (4) "provide an input signal

5    thereto"; (5) "a processor electrically connected to … and configured to manipulate the input

6    signal"; (6) "the output signal being representative of at least one of the parameters of the

7    electrical system"; (7) "a display device . . . configured to display a reading of the output

8    signal"; (8) "the reading being representative of the parameter"; (9) "a keypad configured to

9    allow for switching between measurement modes of the parameters"; and (10) "continuity

10    measurement."

11    **A.  Effect of the Preamble**

12        The Court first determines whether the preamble of Claim 1 operates as a limitation.

13    Terms 1–3 all appear in the preamble of Claim 1. ('899 Patent 11:29–33).  The words of a

14    claim's preamble are not always limiting. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182

15    F.3d 1298, 1305 (Fed. Cir. 1999).  "In general, a preamble limits the invention if it recites

16    essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the

17    claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed Cir. 2002)

18    (quoting *Pitney Bowes*, 182 F.3d at 1305).  "Conversely, a preamble is not limiting 'where a

19    patentee defines a structurally complete invention in the claim body and uses the preamble only

20    to state a purpose or intended use for the invention.'" *Id.* at 808 (quoting *Rowe v. Dror*, 112

21    F.3d 473, 478 (Fed. Cir. 1997)).

22        Here, Claim 1's preamble states: "An electrical test device having multimeter

23    functionality and being adapted to provide current sourcing to an electrical system for selective

24    measurement of a plurality of parameters thereof in at least one of powered and unpowered

25    states, the electrical test comprising . . . ." ('899 Patent 11:29–33).

1     This Court determined that the preamble of Claim 1 was limiting in its first Order

2  Denying Preliminary Injunction, (ECF No. 101).  There, this Court noted that PowerProbe had

3  conceded that the preamble of Claim 1 was limiting. (Order Denying Prelim. Inj. 4:16–24, ECF

4  No. 101).  Further, this Court found that even if PowerProbe had not conceded that the

5  preamble was limiting, the preamble operated as a limitation for two reasons.  First, the

6  preamble "serves to distinguish the patented invention from the prior art" by pointing out the

7  '899 Patent's improvement over problems presented by prior art multimeters and logic probes.

8  (*Id.* 5:3–12).  The preamble of Claim 1 explains that the claimed electrical test device is

9  capable of measuring parameters, unlike logic probes, and capable of testing the electrical

10  system in both the powered and unpowered states, unlike prior art multimeters. (*Id.*).  Second,

11  the preamble gives an antecedent basis for terms which later appear in the body of Claim 1.

12  Specifically, this Court concluded that a POSITA would not understand what "parameters"

13  refers to without understanding that they include parameters of an electrical system measured

14  by a device with "multimeter functionality." (*Id.* 5:13–18).  Because it's reasoning in the Order

15  Denying Preliminary Injunction remains true, the Court construes the preamble of Claim 1 as a

16  limitation.

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

**B.  Term 1: "an electrical test device having multimeter functionality"**

**Proposed Constructions[2]**

| | |
|---|---|
| **PowerProbe** | "An electrical test device having the ability to measure and display at least a plurality of parameters usually measured by a multimeter." |
| **Innova** | "A tester that is configured to measure and display at least resistance, voltage, and current." |

This term appears in Claims 1, 16, and 22.  The parties' dispute centers on the term "multimeter functionality."  PowerProbe contends that the term should be construed to claim a device which measures only "a *plurality* of parameters usually measured by a multimeter." (Op. Br. 4:8, ECF No. 107).  Innova argues that the term should be construed to claim a device which measures at least three parameters: "resistance, voltage, and current." (Claim Construct. Summ. Br. 4:3–4, ECF No. 285).  This Court previously construed the phrase "multimeter functionality" to be "a device with the functionality of a multimeter that measures two or more parameters, such as voltage and continuity." (Ord. Granting Prelim. Inj. 8:2–3).

### *1.  Innova's Proposed Construction*

Innova argues that a POSITA would understand "an electrical test device having multimeter functionality" to be a device having the standard functions of a multimeter in 2005 — namely, the ability to measure *at least* voltage, current, and resistance. (Claim Construct. Summ. Br. 4:3–4).  Innova contends that this construction is consistent with the '899 Patent's own definition of "devices commonly referred to as multi-meters" as devices which "measure resistance, voltage, and current and more." (*Id.* 4:14–19 (citing '899 Patent 1:31–33)).  Innova further points to the '899 Patent's description of the electrical test device as capable of performing a variety of functions "[i]n addition to functions commonly performed by

---

[2] Throughout this Order, PowerProbe's proposed constructions are taken from their Opening Claim Construction Brief, (ECF No. 107), as their proposed constructions have remained the same throughout this litigation. Innova's proposed constructions are taken from their Claim Construction Summation Brief, (ECF No. 285), as their proposed constructions have evolved over the course of this litigation.

multimeters." ('899 Patent 9:18–21). Innova also cites to a definition of "multimeter" provided by Fluke[3] as a device which "must" measure at least voltage, current, and resistance. (Claim Constr. Summ. Br. 5:12–16).

Innova next argues that PowerProbe disavowed a broader meaning of "multimeter functionality" during prosecution. Innova points to two statements made by PowerProbe in its January 2005 Claim Amendment, filed in response to the USPTO's initial rejection of the '899 Patent. ('899 Patent Amendment, Ex. 3 to Resp. Mot. Prelim. Inj. at 45–62, ECF No. 54-3). First, PowerProbe's agreement with the Examiner that "multimeter functionality" was taught by a patent in the prior art, U.S. Patent 6,459,968 ("'968 Patent"), which disclosed a device that measured voltage, current, and resistance. (*See* '899 Patent Amend. at 59, ECF No. 54-3). Second, PowerProbe's statement that U.S. Patent 6,977,493 ("'493 Patent") does not disclose "multimeter functionality." (Response Br. 10:2–4 (citing '899 Patent Amend. at 58)). Specifically, Innova argues that PowerProbe sought to overcome the '493 Patent by describing "multimeter functionality" in the '899 Patent as the measurement of more than three parameters.[4] Thus, Innova contends, PowerProbe disavowed a meaning of "multimeter functionality" as measuring at least two or more parameters.

### 2. *PowerProbe's Proposed Construction*

PowerProbe argues that a POSITA would understand "multimeter functionality" to include "the measurement of at least a plurality of parameters." (Op. Br. 4:8). PowerProbe makes two points in support of this argument.

First, PowerProbe draws a distinction between the word "multimeter" and the phrase "multimeter functionality," arguing that while the former may require measurement of voltage,

---

[3] Both parties agree that Fluke is "an industry leader in multimeters." (Claim Constr. Summ. Br. 5:10–12 (citing PI Hrg. Tr., Day 1 42:19–24, ECF No. 99)).

[4] In the Amendment, PowerProbe described the claimed electrical test device as having "the capability to characterize loaded impedance, wave forms and current drain" in addition to simultaneous measurement of "current and voltage." (*Id.* 10:3–8 (citing '899 Patent Amend. at 56–57)).

current, resistance, and more, the latter describes a device capable of performing only *some* of the functions of a traditional multimeter. (Op. Br. 3:1–11). PowerProbe asserts that the '899 Patent does not teach a multimeter, and indeed "more broadly covers 'test equipment' other than 'multimeters,' including, *e.g.*, 'logic probes.'" (Reply Br. 3:5–6, ECF No. 116 (citing '899 Patent 1:28–38, 1:43–2:14)).

Second, PowerProbe argues that in describing "multimeter functionality," the '899 Patent only ever refers to a "plurality of parameters." (Reply Br. 4:16–17). PowerProbe points first to the remainder of Claim 1, which states that the device is adapted to measure a "plurality of parameters." ('899 Patent 11:30–32). PowerProbe also references col. 9, ll. 8–18 of the specification, which states that the claimed device must measure "at least one" of a list of parameters, and to Claim 10, which also requires measurement of "at least one" of a list of parameters. (*Id.* 4:17–18).

PowerProbe further avers that it did not disavow a broader meaning of "multimeter functionality" during prosecution. (Reply Br. 2:14–23). PowerProbe argues that its statement that the '493 Patent does not disclose "multimeter functionality" did not relate to the number of parameters that must be measured, as the '493 Patent "cannot measure parameters ***at all***." (*Id.* 2:15–17 (citing Ex. 18 to Resp. Mot. Prelim. Inj. 2:55–3:2, ECF No. 54-18)).

### 3. The Court's Claim Construction

The Court declines to adopt Innova's construction and adopts PowerProbe's construction, in part. At its core, Innova's argument rests on the premise that "multimeter functionality" must be construed in line with the '899 Patent's definition of a "multimeter." But, as PowerProbe points out, these two terms are distinct, and the '899 Patent does not claim a "multimeter." Had the patentee intended to claim a device which measures at least voltage, current, and resistance, they would have used the term "multimeter" instead of "multimeter functionality." While a device having multimeter functionality may measure voltage, current,

1  and resistance, such a device would be just one embodiment of the invention. This Court

2  cannot "import into the claims' meaning some narrowing language from one of the patent's

3  preferred embodiments." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005).

4          Further, adopting Innova's construction would read the term "plurality of parameters"

5  out of the '899 Patent entirely. The '899 Patent only ever requires that the claimed electrical

6  test device measure "a plurality of parameters," language that appears in the preamble of Claim

7  1 and the specification. (*See* '899 Patent 11:31–32, 2:10, 3:35). The "well understood

8  meaning" of the word "plurality" is "two or more of something." *Cybersettle, Inc. v. Nat'l Arb.*

9  *F., Inc.*, 243 F.App'x. 603, 606 (Fed. Cir. 2007). Yet Innova's construction of "multimeter

10  functionality" would claim a device that measures at least *three* parameters.

11          The Court finds that the term "a plurality of parameters" governs the minimum number

12  of parameters which must be measured by the claimed electrical test device, not the term

13  "multimeter functionality." In the context of the '899 Patent, a POSITA would understand

14  "multimeter functionality" to denote the ability to measure parameters usually measured by a

15  multimeter. For example, the specification describes the electrical test device performing

16  "functions commonly performed by multimeters," including the measurement of voltage,

17  current and resistance. ('899 Patent 3:43–45). The term "a plurality of parameters" narrows

18  this spectrum by requiring that the claimed electrical test device measure two or more

19  parameters usually measured by multimeters.

20          This is confirmed by the prosecution history. There, both PowerProbe and the Examiner

21  agreed that the '493 Patent did not teach "multimeter functionality" because it disclosed a

22  device which only delivered power to an electrical system and did not measure parameters.

23  ('899 Patent Amend. at 58, 60). Conversely, both PowerProbe and the Examiner agreed that

24  "multimeter functionality" was taught by the '968 Patent because it disclosed a device that

25  measured voltage, current, and resistance. (*See id.* at 58).

Finally, the Court is unpersuaded that PowerProbe disavowed a broader construction of "multimeter functionality" during prosecution. First, while PowerProbe agreed that the '968 Patent taught "multimeter functionality," it never unambiguously asserted that "multimeter functionality" requires measurement of all *three* parameters. (*See* '899 Patent Amend. at 59, 61). Indeed, the discussion focuses on how the '968 Patent lacks the ability to "provid[e] current sourcing to an electrical system," not on how it teaches "multimeter functionality." ('899 Patent Amend. at 61). Second, PowerProbe's description of the '899 Patent as measuring more than three parameters was an "example," and also included the phrase "a plurality of parameters." (*Id.* at 56). The Federal Circuit routinely "decline[s] to apply the doctrine of prosecution disclaimer where the alleged disavowal of claim scope is ambiguous." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). None of the statements offered by Innova rise to such a level, and the Court does not find that PowerProbe disavowed a broader scope of the term "multimeter functionality." The Court adopts PowerProbe's construction, in part, and construes "an electrical test device having multimeter functionality" as "an electrical test device having the ability to measure parameters usually measured by multimeters, such as voltage, current, or resistance."

### C. Term 2: "selective measurement of a plurality of parameters thereof"

**Proposed Constructions**

| | |
|---|---|
| **PowerProbe** | Plain and ordinary meaning: "Measurement" means "an amount or degree of something." "Plurality of parameters" means "two or more attributes." |
| **Innova** | "Quantify a numerical value of user-selected electrical variables of the electrical system capable of being measured for display." |

This term appears in Claims 1, 11, 16, and 22. The Court previously construed "measurement" as "a numerical or quantitative value associated with and indicative of the parameter of the test," and "plurality of parameters" as "at least two parameters." (Order

Denying Prelim Inj. 8:5–8, 9:7–8). The parties dispute the construction of "measurement." Relevant to that construction are two conclusions reached by the Federal Circuit in their Opinion vacating this Court's Order Denying Preliminary Injunction, (ECF No. 141). First, the Federal Circuit found that, within the context of the '899 Patent, "continuity must be construed to be measurable." (Fed. Cir. Op. at 7, ECF No. 141). Second, the Federal Circuit concluded that this Court "wrongly assumed that detecting continuity and measuring continuity are mutually exclusive." (*Id.* at 6).

### 1. *PowerProbe's Proposed Construction*

PowerProbe argues that "measurement" should be construed as "an amount or degree of something." (Op. Br. 5:24). In PowerProbe's Opening Claim Construction Brief, it originally argued that the claimed electrical test device could "measure" parameters without ultimately displaying a numerical value, pointing to non-contact voltage as an example, which "is typically measured and displayed using increasing dashes" rather than a numerical value. (*Id.* 7:8–11). However, both at the *Markman* Hearing and in their Supplemental Brief, PowerProbe appears to concede that "measurement" requires "a numerical or quantitative value," instead directing their arguments towards the inclusion of an instruction that "an internal quantification can satisfy this claim element." (*See Markman* Hr'g Tr. 34:17–19, ECF No. 281); (Supp. Br. 3:1–5, ECF No. 284). In support, PowerProbe points to eight patent references within the intrinsic record of the '899 Patent which describe "measurement" as being accomplished through an internal quantification performed by an analog-to-digital converter ("ADC"). (Supp. Br. 2:4–11 (citing U.S. Patent 6,043,640 7:23–30 (referring to how a "signal . . . is provided to an [ADC] which produces digital measurement values"); U.S. Patent 6,466,003 1:39–44 ("whereupon an A-D converter circuit is provided the input signal for measurement"))).

/ / /

/ / /

1          ### 2. Innova's Proposed Construction

2          Innova argues that this term should be construed to mean "quantify a numerical value of

3  user-selected parameter(s) for display." (Claim Constr. Summ. Br. 6:20–21). Innova begins by

4  focusing on the word "selective" in the term, asserting that it requires "that the user must be

5  able to choose which parameter to measure." (*Id.* 6:26–27). In support of this argument, Innova

6  maintains that the '899 Patent "discloses only manual selection mechanisms for switching

7  between parameters," (*id.* 7:1–2 (citing '899 Patent 8:61–9:3)), and that their construction

8  would be consistent with the parties' agreed-upon definition of "selective powering" as "user-

9  controlled powering." (Claim Constr. Summ. Br. 7:2–5).

10         Regarding the word "measurement," Innova contends that it must be construed to

11  require a numerical value which is perceived by the user of the electrical test device. (*Markman*

12  Hr'g Tr. 42:1–2, 45:19–20). Innova's intrinsic evidence consists of a single line in the

13  specification which states that the electrical system "may be measured with differences there

14  being assessed and displayed." (Resp. Br. 12:1–5 (citing '899 Patent 10:19–21)). Innova

15  mainly relies on extrinsic evidence, including the Institute of Electrical and Electronics

16  Engineers' ("IEEE") definition of "measurement" as "[t]he determination of the magnitude or

17  amount of a quantity by comparison." (Claim Constr. Summ. Br. 7:9–15). Innova also offers a

18  statement by PowerProbe's expert that measurement requires converting an observed voltage

19  into a digital value for display, (*id.* 7:16–26 (citing Tutorial Hr'g Tr. 25:14–17)), and a

20  statement by Mr. Jeffery Whisenand, PowerProbe's CEO in 2005, that "measurement" involves

21  "quantifying something." (*Id.* 7:22–26 (citing Whisenand Depo. Tr. 53:16–25, Ex. A to Claim

22  Constr. Summ. Br., ECF No. 288-1)). Finally, Innova asserts that PowerProbe's "internal

23  quantification" theory conflicts with their own admission that "internal quantification . . . is not

24  discussed by the '899 Patent," and that "the concept of measurement is from the perspective of

25  the user." (Claim Constr. Summ. Br. 8:11–15 (citing Op. Br. at n. 40)).

1    Finally, Innova furthers a construction of "parameters" as "distinct electrical variables"

2  of the electrical system under test." (*Markman* Hr'g Tr. 47:11–12).  Innova bases this

3  construction on the word "thereof" in the term, which Innova characterizes as referring directly

4  to the electrical system. (*Id.* 46:24–47:6).

5    ### 3.  *The Court's Claim Construction*

6    The parties dispute the construction of three separate words in this term: "selective,"

7  "measurement," and "parameters."  The Court addresses each in turn.

8    #### i.    *"Selective"*

9    The Court is persuaded that "selective" should be construed to require "user-selection,"

10  and adopts Innova's construction.  Of particular importance is the parties' agreed-upon

11  construction of "selective powering" as "user-selected powering." (Agreement Narrow

12  Disputed Terms 2:10–13).  The Court sees no reason to construe the same word differently in

13  this term.

14    #### ii.    *"Measurement"*

15    The Court adopts PowerProbe's construction of "measurement" as "an amount or degree

16  of something."  The purpose of claim construction is to give each term the meaning that it

17  would have to a POSITA "in the context of the entire patent, including the specification."

18  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).  While in the abstract

19  "measurement" may refer to a quantitative or numerical value, the '899 Patent never explicitly

20  cabins the scope of "measurement" in this way.  Indeed, the specification and the claims of the

21  '899 Patent consistently refer to circuit continuity—a parameter that itself cannot be

22  quantified—as measurable. (*See* '899 Patent 4:48, 8:37–39, 9:9–11, 12:21–24 (Claim 10),

23  12:51–54 (Claim 12)); (*see also* Fed. Cir. Op. at 3 ("[T]he inventor used the term continuity as

24  a measurable quantity.")).  While the '899 Patent sometimes refers to continuity as "detected,"

25  (*see* '899 Patent 12:1–3 (Claim 3), 13:32–33 (Claim 17)), within the context of the '899 Patent,

"detecting continuity and measuring continuity" are not "mutually exclusive." (Fed. Cir. Op. at 6). The intrinsic record strongly indicates that the patentee did not intend "measurement" to require a quantitative or numerical value.

The extrinsic evidence offered by Innova is unpersuasive. While reputable, accepting the IEEE definition of "measurement" would contradict the intrinsic record. The Federal Circuit has criticized reliance on dictionary definitions for this very reason, warning that they improperly "focus[] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Phillips*, 415 F.3d at 1321.[5] Finally, while this construction of "measurement" differs from this Court's construction of "measurement" at the preliminary injunction stage, it is well-settled that courts may alter claim constructions determined at the preliminary injunction phase later in the proceedings. *See Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002).

### iii. *"Plurality of parameters"*

The parties agree that "plurality" means "two or more." *Cybersettle*, 243 F.App'x. at 606; (*Markman* Hr'g Tr. 46:23–24). As discussed above, (*see* Section (V)(B)(3)), this term governs the minimum number of the parameters that the claimed electrical test device measures. Turning to "parameters," the Court begins at the language of the claim in which this term appears. The preamble of Claim 1 requires that the electrical test device be "adapted to provide current sourcing to an *electrical system* for selective measurement of a plurality of parameters *thereof*." ('899 Patent 11:30–32 (emphasis added)). The word "thereof" refers to the electrical system, thus connecting the "parameters" to the electrical system under test. While the Court agrees with Innova that this connection should be specified in the construction of "parameters," the Court declines to further recast "parameters" as "variables." The plain and

---

[5] Because the Court declines to construe "measurement" to require a quantitative or numerical value, the Court need not reach PowerProbe's argument in favor of an instruction that "an internal quantification can satisfy this claim element." (Supp. Br. 3:1–5).

ordinary meaning of "parameter" is clear on the face of the term itself, and Innova provides no intrinsic evidence to support a substitution of that word with a different one. Thus, the Court construes "plurality of parameters" as "two or more parameters of the electrical system."

In conclusion, the Court hereby construes this term in its entirety as "user-selected measurement of two or more parameters of the electrical system," where "measurement" means to determine an "amount or degree of something."

/ / /

## D. Term 3: "in at least one of powered and unpowered states"

### Proposed Constructions

| PowerProbe | Plain and ordinary meaning: "Wherein the electrical system is powered via the electrical test device, or wherein the electrical system is not powered via the electrical test device." |
|---|---|
| Innova | "While the system under test is operational (powered) or the system under test is non-operational (unpowered)." |

This term appears in the preamble of Claim 1. Here, the parties dispute what power source places the device in the "powered" or "unpowered" states. PowerProbe contends that the term refers to whether power is flowing to the electrical system under test from the electrical test device. (*Markman* Hr'g Tr. 56:18–22). Conversely, Innova argues that the term refers to whether the power is flowing to the electrical system under test *at all*, regardless of the source. (Claim Constr. Summ. Br. 10:12–14).

### 1. PowerProbe's Proposed Construction

PowerProbe argues that the "powered state" refers to when the electrical system under test receives power from the claimed electrical test device, and the "unpowered state" refers to when the electrical system under test is not receiving power from the electrical test device.

1   (*Markman* Hr'g Tr. 57:15–17).[6]  Thus, even when the electrical system is receiving power from

2   a source other than the electrical test device—for example, a car battery—PowerProbe would

3   still construe the electrical system to be in the "unpowered state." (*Id.* 64:18–20).  PowerProbe

4   argues that its construction comports with the intrinsic record for two reasons.  First,

5   PowerProbe contends that because Claim 1 is "directed to what the [electrical test] device is

6   doing," the "powered and unpowered states" must refer to power which is supplied by the

7   electrical test device. (*Id.* 62:15–16).  Second, PowerProbe avers that the specification

8   consistently describes the electrical test device as "powering" the electrical system. (Op. Br.

9   8:16–17 (citing Ex. 1 to Op. Br. ¶¶ 44–45, ECF No. 107-1 (citing '899 Patent 2:48–53, 3:54–

10  57, 4:49–53, 4:58–65, 9:48–57, 9:64–65))).

11              ## 2.  *Innova's Proposed Construction*

12              Innova argues that the "powered and unpowered states" refer "to the state of the

13  [electrical] system under test," not PowerProbe's electrical testing device. (*Markman* Hr'g Tr.

14  59:22–23).  In support of this argument, Innova points to the language surrounding this term in

15  Claim 1, which recites: "an electrical system for selective measurement of a plurality of

16  parameters thereof in at least one of the powered or unpowered states." (Claim Constr. Summ.

17  Br. 10:6–7).  According to Innova, the word "thereof" refers to the electrical system under test,

18  *not* the electrical test device. (*Id.* 10:7–8).  Further, Innova argues that the specification equates

19  "powered state" and "unpowered state" to an "operational" or "inoperative" state of the

20  electrical system under test, regardless of the power source. (*Id.* 10:8–14 (citing '899 Patent

21  1:41–52)).  Innova contends that its construction is confirmed by the prosecution history, where

22

23  _____

24  [6] PowerProbe's current proposed construction is identical to the proposed construction set forth in its Opening
    Claim Construction Brief, while Innova's proposed construction has evolved.  The dispute over the source of
25  power upon which the parties now focus was not briefed in the parties' initial Claim Construction Briefs. (*See
    generally* Op. Br. 8:14–21; Resp. Br. 13:12–22; Reply Br. 6:4–6).  Thus, most of PowerProbe's arguments come
    from the *Markman* Hearing, whereas Innova's come from their Claim Construction Summation Brief.

PowerProbe described the "powered or unpowered state" limitation in relation to the electrical system under test. (Claim Constr. Summ. Br. 10:15–17 (citing '899 Patent Amend. at 56)).

Finally, Innova argues that PowerProbe's construction is inconsistent with the "active mode" and "passive mode" limitations in Claim 2, a dependent claim to Claim 1. (Claim Constr. Summ. Br. 10:19–22). Unlike Claim 1's treatment of "powered and unpowered states," Claim 2 defines the "active mode" and "passive mode" in relation to PowerProbe's electrical testing device, *not* the electrical system under test. (*Markman* Hr'g Tr. 60:21–61:2). Specifically, Claim 2 defines the "active mode" as "measurement of the parameters during powering of the electrical system," and the "passive mode" as "measurement of the parameters without powering the electrical system." ('899 Patent 11:55–58).

### 3. The Court's Claim Construction

The Court is persuaded by Innova's arguments and adopts its proposed construction. "[E]ach claim in a patent is presumptively different in scope." *RF Delaware, Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1263 (Fed. Cir. 2003). This presumption is based on "the commonsense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Anderson Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369 (Fed. Cir. 2007) (citing *Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971–72 (Fed. Cir. 1999)). In cases of "pure" claim differentiation, where there is no meaningful difference between an independent claim and its dependent claim *except* for the presence of an added limitation in the dependent claim, the presumption that the independent claim is *not* restricted by the added limitation in the dependent claim is especially strong. *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007). If the independent claim were restricted by the added limitation in the dependent claim, the dependent claim would be rendered "superfluous." *Anderson*, 474 F.3d at 1369–70.

Of course, this presumption may be overcome by evidence to the contrary in "the written description and prosecution history." *Id.* at 1370.

Here, the term for construction appears in Claim 1, an independent Claim on which Claim 2 depends. The only difference between Claim 1 and Claim 2 is the added limitation defining the "active mode" and "passive modes" in Claim 2. (*See* '899 Patent 11:29–59). The Court agrees with Innova that if "powered and unpowered states" were construed as the electrical system under test being powered and unpowered by the electrical test device, respectively, the added "active mode" and "passive mode" limitations in Claim 2 would be rendered superfluous. *See Anderson*, 474 F.3d at 1369–70. Thus, there is a "strong presumption" that the term "powered and unpowered states" has a different meaning than "active mode" and "passive mode."

This presumption is not overcome by the intrinsic record. The specification consistently describes the "active mode" and "passive mode" as involving "powering of the electrical system under test" performed by PowerProbe's electrical test device. (*See, e.g.*, '899 Patent 2:48–53, 4:54–65). Indeed, while PowerProbe cites seven portions of the specification to support its proposed construction, all but three explicitly describe the "active mode" and "passive mode." (*See* Op. Br. 8:16–17 (citing Ex. 1 to Op. Br. ¶¶ 44-45 (citing '899 Patent 2:48–53, 4:58–65, 9:48–57, 9:64–65))). Two of the remaining citations describe the electrical test device as "powering" the electrical system under test, but do not reference the "powered and unpowered states." ('899 Patent 3:54–57, 4:49–53). PowerProbe's final citation of nearly the entire "Background of the Invention" section is also unavailing. There, the '899 Patent describes the "powered state" as simply the state in which an electrical system has power. (*See id.* 1:41–61). As Innova points out, the specification "equates 'powered state' and 'unpowered state' to an 'operational' or 'inoperative' state" of the electrical system under test, making no

distinctions about the source of that power. (Claim Constr. Summ. Br. 10:8–14 (citing '899 Patent 1:41–52)).

The specification makes clear that the "active mode" and "passive mode" limitations refer to when the electrical test device is powering the electrical system under test, and when it is not. Neither the claims nor the specification requires that "powered and unpowered states" refer to powering of the electrical system under test *by* the electrical test device. To construe them as such would contradict the intrinsic record and violate the doctrine of claim differentiation.[7] Therefore, the Court adopts Innova's construction of "in at least one of powered and unpowered states" as "while the system under test is operational (powered) or the system under test is non-operational (unpowered)."

### E. Term 4: "input signal"[8]

### Proposed Constructions

| PowerProbe | Plain and ordinary meaning: "Electrical quantity such as a voltage or current that represents or conveys information." |
|---|---|
| Innova | Plain and ordinary meaning: "A varying voltage or current that represents or conveys information." |

This term appears in Claims 11, 16, and 22. The parties raise two disputes over this term. First, the parties dispute whether "input signal" should be construed as "varying." Second, the parties disagree about what constitutes an "input signal." The parties agree that the "input signal" must "represent or convey information." (*See* Agreement Narrow Disputed Terms 2:1–6). In its Order Granting Preliminary Injunction, this Court construed "input signal" as including both voltage and current. (Order Granting Prelim. Inj. 9:16–17).

---

[7] The Court acknowledges that "[c]laim differentiation is a guide, not a general rule." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991) (quoting *Autogiro Co. of America v. United States*, 384 F.2d 391, 404 (Ct. Cl. 1967)). However, it is to be disregarded only when "a claim will bear only one interpretation." *Id.* Here, the specification supports the Court's construction of "powered and unpowered states," and the doctrine of claim differentiation is thus preserved.

[8] While this term originally read "provide an input signal thereto," the parties narrowed their dispute to the meaning of the term "input signal." (Agreement Narrow Disputed Terms 2:1–6).

### 1.   Innova's Proposed Construction

Innova first argues that the intrinsic record requires that "input signal" be construed as "varying." (Claim Constr. Summ. Br. 11:2–3).  Innova contends that a construction of "input signal" which omits "varying" would broaden the scope of "input signal" to include current and voltage used to power the electrical system under test.  It asserts that this is impermissible because the '899 Patent distinguishes between the "input signal" and current or voltage used to power the electrical system under test.  In support of this argument, Innova explains that because the '899 Patent states that "[p]referably, the voltage regulated output is provided independent of any input signal to the electrical system under test," the "input signal" cannot be "any voltage used to power the system." (Claim Constr. Summ. Br. 11:14–17 (citing '899 Patent 4:16–20)).  Similarly, Innova asserts that if a current supplied to the electrical test device could constitute an "input signal," the separate term "current sourcing" would be rendered superfluous. (Claim Constr. Summ. Br. 11:7–13 (citing *Tandon Corp. v. U.S. Int'l. Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987))).

Innova next argues that PowerProbe has acknowledged the distinction between "input signal" and current or voltage used to power the electrical system by stating that an input signal may be provided "where there is no current sourcing." (Claim Constr. Summ. Br. 11:17–20 (citing Resp. Mot. Leave File Doc. 20:26–27, ECF No. 79)).  It also contends that PowerProbe has conceded that the "input signal" is "varying."  Specifically, Innova points to two varying input signals mentioned by PowerProbe: the time-varying voltage which ADCs receive as an input, and "digital pulse trains," which are "inherently varying." (Claim Constr. Summ. Br. 11:21–27).

### 2.   PowerProbe's Proposed Construction

PowerProbe first contends that this term requires no construction, citing several cases in which district courts declined to construe "input signal." (Op. Br. 8:28 (citing *Oplus Techs.,*

*Ltd. v. Sears Holding Corp.*, No. 12-cv-5707-MRP, 2013 WL 11521845, at *6 (C.D. Cal. Jan. 14, 2013) (finding no construction needed to construe "streaming digital video image input signal"); *ATEN Int'l Co. v. Uniclass Tech.*, No. 15-cv-04424, 2016 WL 6666819, at *9 (C.D. Cal. Apr. 27, 2016) (finding no construction needed to construe "first input signal"))).

PowerProbe next argues that voltage and current are examples of "input signals" and not an exhaustive list. In support of this argument, PowerProbe points to another input signal contemplated by the '899 Patent—digital pulse trains. ('899 Patent 6:23–25 ("[A] digital pulse train may be inputted into a device of the electrical system.")). While conceding that "on some fundamental level," a digital pulse train "may be a voltage or a current," PowerProbe maintains that "it is its own definable . . . signal" that Innova's proposed construction would omit. (*Markman* Hr'g Tr. 70:14–16). PowerProbe further relies on a description of "signal" as "referring to a wide variety of information" which may take "the form of an electrical quantity," (6 Roland Premier, *Introductory Signal Processing* 1 (1991), ECF No. 107-7), and the Merriam-Webster dictionary definition of "signal" as "a detectable physical quantity or impulse (such as a voltage, current, or magnetic field strength)." (Op. Br. 9:5–8 (citing Signal Definition, *Mirriam-Webster's Dictionary of the English Language*, ECF No. 60-18)). Moreover, PowerProbe points out inconsistencies in Innova's proposed construction of this term. Specifically, while Innova argued at the preliminary injunction stage that "input signal" could not include current, Innova now argues that "input signal" *must* be either a current or voltage. (*Compare* Resp. Mot. Prelim. Inj. 12:11, *with* Claim Constr. Summ. Br. 11:2–3).

Finally, PowerProbe denies that "input signal" must be construed as "varying," citing testimony from its expert explaining that while an "input signal" may be varying, there are "at least two scenarios" in which it is not. (Op. Br. 10:1–5 (citing Ex. 1 to Op. Br. ¶¶ 48–50)). PowerProbe also points to term 6, which includes "input signal." However, Innova's proposed

construction of term 6 does not include the word "varying," instead construing "input signal" as "information conveyed to the electrical system." (*Markman* Hr'g Tr. 75:5–10).

### 3. The Court's Claim Construction

The Court analyzes the two disputes between the parties in turn.

#### i. The "input signal" need not be varying

The Court first concludes that there is insufficient support in the '899 Patent for construing "input signal" as "varying." Innova offers no explicit intrinsic support for construing "input signal" as "varying"; indeed, the '899 Patent never uses the word "varying" in either the specification or the claims. (*See generally* '899 Patent). Instead, Innova argues that without "varying," "input signal" would be impermissibly construed as synonymous with providing current and voltage to power the electrical system under test.

First, Innova asserts that the '899 Patent distinguishes between the "input signal" and "voltage used to power the system." (Claim Constr. Summ. Br. 11:14–17 (citing '899 Patent 4:16–20)). However, the portion of the specification upon which Innova relies discusses "voltage regulated output for all circuitry *in the electrical test device*," not for the electrical system under test. (*See* '899 Patent 4:16–20, 2:33–35). It makes perfect sense that the "input signal," which is "provided to the electrical system under test," would be different from a voltage provided to the electrical test device itself. Thus, this distinction has no bearing on the meaning of "input signal."

Second, Innova argues that a construction of "input signal" as including non-varying current would render the term "current sourcing" superfluous. (Claim Constr. Summ. Br. 11:11–13 (citing *Tandon*, 831 F.2d at 1023)). That would only be true, however, if "input signal" were construed to exclusively mean current. Where "input signal" is construed to mean "an electrical quantity *such as* voltage or current," the two terms are meaningfully distinct.

1    Finally, Innova points to PowerProbe's own use of "varying" input signals, namely

2    "time-varying voltage" as an input to an ADC, and a "digital pulse train," which is "inherently

3    varying." (Claim Constr. Summ. Br. 11:21–27).  But the '899 Patent makes no mention of an

4    ADC, nor does PowerProbe contend that "time-varying voltage" would serve as an "input

5    signal" in the context of the claimed electrical test device.  While the '899 Patent does

6    reference a "digital pulse train" as a potential "input signal," ('899 Patent 6:23–24), one section

7    of the specification cannot restrict the scope of the claims.  If anything, the use of a "digital

8    pulse train" as an "input signal" may reference a preferred embodiment of the invention.  As

9    the Federal Circuit has instructed, it is "improper to read limitations from a preferred

10   embodiment described in the specification . . . into the claims absent a clear indication in the

11   intrinsic record that the patentee intended the claims to be so limited." *GE Lighting Sols., LLC

12   v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).  Here, neither Innova nor the '899

13   Patent provide evidence of such an intention.  While an "input signal" *may* be varying, the

14   Court concludes that it cannot be construed to *always* be varying.

15                    *ii.       "Current and voltage" are exemplary, not exhaustive*

16       The Court next concludes that "current and voltage" are examples of an "input signal,"

17   not an exhaustive list of all "input signals" contemplated in the '899 Patent.  Innova offers no

18   intrinsic evidence in its briefing or in its remarks at the *Markman* Hearing that supports

19   construing "input signal" as *only* a current or voltage. (*See* Claim Constr. Summ. Br. 11:2–27);

20   (*see also Markman* Hr'g Tr. 65:15–69:10, 81:24–83:1).  The '899 Patent never explicitly limits

21   "input signal" to current or voltage, and indeed contemplates a broad meaning for the term.  For

22   example, the specification describes the electrical test device as injecting an "appropriate input

23   signal" into the electrical system depending on the parameter being measured. ('899 Patent

24   10:24–28).  While the '899 Patent describes the electrical test device as "inputting" current into

25   the electrical system "during continuity testing," (*id.* 10:8–14), that alone cannot be read to

introduce a further limitation into the term "input signal." *See Phillips*, 415 F.3d at 1323.  This reading of the '899 Patent is consistent with extrinsic evidence offered by PowerProbe describing "input signal" as "referring to a wide variety of information" that may take "the form of an electrical quantity." (6 Roland Premier, *Introductory Signal Processing* 1 (1991)).

Thus, the Court adopts Plaintiff's construction of "input signal" as an "electrical quantity such as a voltage or current that represents or conveys information."

## F. Term 5: "a processor electrically connected to . . . and configured to manipulate the input signal"

### Proposed Construction

| PowerProbe | <ul><li>"Processor" means "portion of the electrical test device that controls the operation of the electrical test device."</li><li>"Manipulate" means "adapt or change."</li></ul> |
|---|---|
| Innova | "A processing component that controls tester operations, including modifying information conveyed to the electrical system." |

This term appears in Claims 1, 11, 16, and 22.  The parties have approached construction of this term differently: Defendant seeks to construe the entire term, while Plaintiff seeks to separately construe two words within the term ("processor" and "manipulate").  This Court previously construed "processor" as including a microprocessor and manipulating voltage. (Order Granting Prelim. Inj. 12:10–11).

"The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005) (citations omitted).  When the claim language is "clear on its face," the Court's "consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified." *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001).

Here, the Court finds that the phrase "electrically connected to . . . and configured to manipulate" is not the kind of "terse language" that requires further elaboration before the jury

can understand its meaning. *Terlep*, 418 F.3d at 1382. The meaning of the phrase is "clear on its face," and the parties offer no genuine dispute for that meaning. While the parties further different constructions for "manipulate"—PowerProbe construes it to mean "adapt or change" while Innova construes it to mean "modifying"—the ultimate meaning remains the same. Thus, as the parties have presented no genuine dispute about the meaning of "electrically connected to . . . and configured to modify," the Court finds that no construction of this portion of the term is necessary. *See O2 Micro Int'l Ltd. v. Beyond Innovation Technology Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). Further, the Court sees no reason to duplicate its construction of "input signal" in this term. Thus, the Court focuses on the core dispute between the parties in this term—the construction of "processor."

### 1. *PowerProbe's Proposed Construction*

PowerProbe raises two critiques of Innova's proposed construction. First, PowerProbe asserts that the "processor" does more than "modifying information conveyed to the electrical system." Rather, it "controls all functions of the electrical test device." (Op. Br. 11:8–10 (citing to '899 Patent, 2:35–37)). Second, PowerProbe contends that "processor" should not be construed as a single "component" of the electrical test device but rather as a "portion" of the electrical test device. In support of this argument, PowerProbe notes that the specification states that the processor "may be configured as a microprocessor." (Op. Br. 10:18–19) (citing '899 Patent 3:62–64)). It draws a distinction between "microprocessor" and "processor," arguing that the while the former is a "single chip," the latter is "a larger term which might include a microprocessor, [or] more than one microprocessor." (*Markman* Hr'g Tr. 89:5–6, 89:10–11). PowerProbe contends that Innova's construction would narrow the definition of "processor" to that of a "microprocessor," thus limiting the claim to one of its preferred embodiments. (Op. Br. 11:6–7). In support of its argument, PowerProbe cites several other cases in which courts have declined to narrow disputed terms to require a single component.

*See, e.g.*, *Rambus Inc. v. Hynix Semiconductor Inc.*, No. C-05-0034 RMW, 2008 WL 5771128, at *2 (N.D. Cal. Nov. 21, 2008) (finding that a POSITA would not "conclude that a 'memory device' is limited to a single chip"); *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, No. 5:13-cv-538 GLS/DEP, 2015 WL 903018, at *2 (N.D.N.Y. Mar. 3, 2015) (finding "no indication" that the patentee intended "to restrict the term connector body to a single unitary structure").

PowerProbe further contends that its construction of "processor" is consistent with the prosecution history and extrinsic evidence. First, PowerProbe points to the Examiner's conclusion that the "processor" in the '899 Patent "is equivalent to 'any one or more of the microprocessors'" disclosed in the '493 Patent. ('899 Patent Amend. at 39, 51). PowerProbe asserts that Innova's construction would restrict "processor" to only *one* microprocessor, thus contradicting the intrinsic record. Second, PowerProbe cites to the IEEE definition of "processor," which identifies at least five components which may be found within a "processor." (*See* IEEE Defs. at 2, Ex. C to Resp. Br., ECF No. 115-3).

## 2. Innova's Proposed Construction

Innova argues that the '899 Patent identifies the processor as "a distinct component responsible for controlling the tester's operations." (Claim Constr. Summ. Br. 12:13–14). In support, Innova cites to the '899 Patent's interchangeable use of "processor" and "microprocessor," and the '899 Patent's description of the "processor" as manipulating the input signal, receiving the output signal, and processing the output signal for display. (*Id.* 12:14–19 (citing '899 Patent 4:65–67, 5:33–36, 7:27–37, 11:39–42, 11:42–47)). Innova further argues that the specification distinguishes the "processor" from other functional blocks in Figure One "which are described as 'connected to' the processor, but not a part of it." (*Id.* 12:20–23 (citing '899 Patent 5:33–36, Fig. 1)). Thus, Innova asserts, the "processor" must be construed as a "discrete, identifiable component." (*Id.* 12:23).

1    Moreover, Innova contends that PowerProbe's proposed construction fails to delineate

2    the boundaries of the claim with reasonable certainty. (*Id.* 12:27–13:1).  Specifically, Innova

3    singles out the words "portion" and "operation" as impermissibly vague, asserting that such a

4    construction would raise invalidity concerns. (*Id.*)

5    Finally, at the *Markman* hearing, Innova distinguished between the '493 Patent and the

6    '899 Patent, arguing that the former featured "two microprocessors . . . in different devices,"

7    thus foreclosing any comparison to the '899 Patent, which features only one device. (*Markman*

8    Hr'g Tr. 103:11).

9    ### 3. The Court's Claim Construction

10    For the reasons discussed below, the Court adopts PowerProbe's construction.  The

11    parties have identified two disputes regarding the construction of "processor."  First, whether

12    "processor" should be construed as a "portion of the electrical test device" or as a

13    "component," and second, whether "processor" should be construed as "control[ing] the

14    operation of the electrical test device" or as "control[ing] tester operations."  The Court

15    analyzes each dispute in turn.

16    *i.    "Processor" must be construed as a "portion of the electrical test device"*

17    The Court agrees with PowerProbe that a POSITA would understand "processor" to

18    refer to a "portion" of the electrical test device rather than a "component."  This conclusion is

19    compelled by the intrinsic record and confirmed by the prosecution history and extrinsic

20    evidence.

21    First, when referring to "processor," the '899 Patent consistently uses "processor *or*

22    microprocessor." (*See, e.g.*, '899 Patent 4:23–24, 4:29–31, 4:37–38, 4:66–67, 5:5–14 (emphasis

23    added)).  Even if a POSITA would understand a "microprocessor" to be a single component,

24    the '899 Patent makes clear that the "processor *may be* configured as a microprocessor," not

25    that it *must be*. ('899 Patent 3:62–64 (emphasis added)).  Had the patentee intended to limit

1    "processor" to "microprocessor," the '899 Patent would have done away with the term

2    "processor" entirely.  Further, the '899 Patent never describes the "processor" as a single

3    component.  Innova's argument that the "processor" is a "discrete, identifiable component"

4    because Figure One depicts it as its own functional block is unavailing. (Claim Constr. Summ.

5    Br. 12:20–23).  Indeed, the specification explicitly disclaims the idea that each functional block

6    denotes a separate component, explaining that "although each of the functional blocks is

7    indicated as a separate block, *componentry may be shared therebetween*." ('899 Patent 5:30–

8    33).

9            This is confirmed by the Examiner's conclusion that the "processor" in the '899 Patent

10   "is equivalent to 'any one or more of the microprocessors'" disclosed in the '493 Patent. ('899

11   Patent Amend. at 48, 60).  Adopting Innova's construction would limit the "processor" to a

12   single component, thus creating another conflict with the intrinsic record.  While Innova

13   correctly notes that the microprocessors in the '493 Patent were contained in separate devices,

14   that distinction does not displace the Examiner's conclusion that the '899 Patent's "processor"

15   may take the form of a "one or more" microprocessors.  Finally, the IEEE definition of

16   processor referenced by PowerProbe further confirms that a POSITA would not understand

17   "processor" as limited to a single component. (IEEE Defs. at 2)

18           This dispute is similar to that addressed by the district court in *PPC Broadband, Inc.*,

19   2015 WL 903018, at *2.  There, the court declined to construe the term "connector body" as

20   limited to a "single unitary structure" because there was "no indication" that the patentee

21   "intended to restrict the term . . . to a single unitary structure." *Id.* (citing *Home Diagnostics,*

22   *Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal in the

23   specification or the prosecution history, the patentee is entitled to the full scope of its claim

24   language.")).  Here, because there is no evidence in the intrinsic record that the patentee

25

intended to restrict "processor" to a single component, it is entitled to its full scope, and there is no basis to limit it to a single component.

### ii. The processor "controls all functions of the electrical test device"

The Court now turns to the second dispute between the parties on this term, which is narrow. Indeed, there is little difference between the parties' constructions. PowerProbe argues that the "processor" should be construed to "control the operation of the electrical test device," while Innova argues that "processor" be construed to "control tester operations."

First, the '899 Patent consistently states that the "processor" "controls all the functions of the electrical test device." ('899 Patent 4:34–35, 2:35–36). Both parties' constructions comply with this description. However, Innova's use of the word "tester" would introduce a new term which has no antecedent basis in the '899 Patent. The claimed device is consistently referred to as the "electrical test device," while "tester" is used to denote the "dual continuity tester," a portion of the electrical test device. (*See, e.g.*, *id.* 2:60–61, 5:17).

Second, Innova's argument that Plaintiff's construction creates ambiguity by referencing an "unspecified 'operation'" is unpersuasive. (Claim Constr. Summ. Br. 12:24–26). Indeed, Innova also deploys the word "operation" in its construction. Innova seems to argue that PowerProbe's use of the word is ambiguous because, unlike Innova's, PowerProbe's construction includes no example of an "operation." But the processor does not control some operations and not others—as the specification instructs, the processor controls "*all the functions* of the electrical test device." ('899 Patent 4:34–35 (emphasis added)). Therefore, the boundaries of the claim are clear. However, the Court finds that a more accurate construction of "processor" replaces "the operation of the electrical test device" with "all the functions of the electrical test device." The latter phrase is how the specification consistently describes the "processor," while the former phrase may create juror confusion with another term in the '899 Patent, the "keypad." (*See* Section (V)(I)).

Finally, the Court similarly finds that "portion" is not so vague as to raise invalidity concerns. While a patent must provide "clear notice of what is claimed . . . absolute precision is unattainable." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909–10 (2014). Here, the specification's instructions that the "processor" "controls all the functions of the electrical test device" clarifies what "portion" of the device is being referenced. Thus, a POSITA would have clear notice of what "portion" of the electrical test device the "processor" encompasses.

Thus, the Court adopts PowerProbe's construction of "processor," in part, as "portion of the electrical test device that controls all the functions of the electrical test device."

### G. Term 6: "the output signal being representative of at least one of the parameters of the electrical system."

**Proposed Constructions**

| PowerProbe | No construction necessary. "Representative" means "serving to represent." |
|---|---|
| Innova | "A signal that conveys information about at least one selected parameter of the system under test." |

This term appears in Claims 1, 11, 16, and 22. Again, the parties have approached construction of this term differently. PowerProbe argues that the term requires no construction and seeks only to construe "representative." (Op. Br. 12:16–18.) Innova seeks to construe the term as a whole. (Claim Constr. Summ. Br. 13:17–18.)

#### 1. *PowerProbe's Proposed Construction*

PowerProbe argues that the meaning of this term is clear when read in conjunction with a separate claim term, which states that the processor of the electrical test device "receives an output signal in response to the input signal." ('899 Patent 11:39–42); (*Markman* Hr'g Tr. 107:1–10).[9] According to PowerProbe, that this term "is an explanation" of "output signal" in that it adds an additional requirement that the "output signal" be "representative of" one of the

---

[9] The parties agreed on the construction of this term. (*See* Section (IV)(B)).

plurality of parameters which the electrical test device measures. (*Markman* Hr'g Tr. 107:8–10, 107:23–24).  PowerProbe avers that a POSITA would "readily understand the word 'representative,'" and that the Court need not construe it. (Reply Br. 8:4–6).

### 2. *Innova's Proposed Construction*

Innova argues that "representative of" implies a correlation between the "output signal" received by the processor of the electrical test device and the parameter being measured. (Claim Constr. Summ. Br. 13:22–23); (*Markman* Hr'g Tr. 109:8–10).  It contends that PowerProbe's construction is inadequate because it would treat "any electrical response as sufficient" and thus "fails to require a meaningful correlation between the signal received from the electrical system and the parameter selected for measurement." (Claim Constr. Summ. Br. 13:19–21).  Innova further cites to the '899 Patent as "describing the output signal as part of a diagnostic process." (*Id.* 14:3–4 (citing '899 Patent 2:42–45)).  Finally, Innova proposes that "at least one of the parameters" be construed as "at least one *selected* parameter of the system under test." (*Id.* 13:17–18 (emphasis added)).

### 3. *The Court's Claim Construction*

The Court finds that this term needs no construction.  Claim construction starts with the language of the claim itself. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  This term, as both parties acknowledge, serves to further define "output signal" as being "representative of at least one of the parameters." (*Markman* Hr'g Tr. 107:5–7, 109:8–10).  Further, the parties have agreed that "output signal," should be construed as "an electrical signal received from the electrical system." (Agreement Narrow Disputed Terms 2:7–8).  Thus, two questions remain before the Court on this term.  First, how should "representative" be construed to effectuate the correlation between the "output signal" and the parameter being measured?  And second, what does "at least one of the parameters" refer to?

On the first question, the Court finds that "representative of" is not the kind of "terse language" that requires further elaboration before the jury can understand its meaning. *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005). The plain and ordinary meaning of "representative of" adequately captures the requisite correlation between the output signal and the parameter being measured. Further, Innova fails to provide sufficient intrinsic evidence to overcome that plain and ordinary meaning. In support of its proposed construction, Innova cites to the specification's description of the output signal "as part of a diagnostic process." (Claim Constr. Summ. Br. 14:3–4). But the portion of the specification upon which Innova relies also uses the phrase "representative of." ('899 Patent 2:44–45). Confusingly, Innova's arguments seem to address the parties' agreed upon construction of "output signal." Specifically, Innova avers that a construction of this term "which treats any electrical response as sufficient" fails to capture the requisite correlation between the "output signal" and the parameter being measured. (Claim Constr. Br. 13:19–21). But PowerProbe's construction requires no such thing; by proposing that this Court construe "representative of" in line with its plain and ordinary meaning, PowerProbe's construction would not treat *any* "electrical response as sufficient," but only an electrical response that represents the parameter being measured. Indeed, Innova's argument only makes sense when viewed as a critique of the construction of "output signal," which it has again agreed to. (Agreement Narrow Disputed Terms 2:7–8). Thus, the Court sees no reason to replace "representative of" with the phrase "conveys information about."

On the second question, the Court finds that the structure of Claim 1 makes clear that "at least one of the parameters" unambiguously refers to one of the "plurality of parameters" that the electrical test device measures. The latter phrase appears in the preamble of Claim 1 and provides an antecedent basis for "at least one of the parameters" in this term. While Innova proposes that this Court construe "at least one of the parameters" to mean "at least one of the

*selected* parameters," they provide no intrinsic support. (Claim Constr. Summ. Br. 13:18). Accordingly, the Court sees no reason to inject an additional word into the otherwise clear language of the term, and finds that this term needs no construction.

### H. Term 7 ("a display device . . . configured to display a reading of the output signal") and Term 8 ("the reading being representative of the parameter")

**Proposed Constructions**

| PowerProbe | No construction necessary.  "Display a reading" means "show a reading of the output signal on a screen." |
|---|---|
| Innova | "A display that presents a numerical value of the signal from the electrical system, where the reading is a numerical value of the selected parameters." |

These terms appear together in Claims 1, 11, 16, 22, and 25.  The parties agree that terms 7 and 8 can be considered together, (*Markman* Hr'g Tr. 111:10–12), and dispute the construction of both "reading" and "parameter."

#### 1.  PowerProbe's Proposed Construction

PowerProbe argues that these terms require no construction and contends that the plain and ordinary meaning of "display a reading" is "show a reading of the output signal on a screen." (Op. Br. 13:14–16, 14:12–13); (*Markman* Hr'g Tr. 114:14–15).  PowerProbe asserts that "reading" as it appears in term 9 requires no construction because term 8 defines "reading" as a "representat[ion] of the parameter." (*Id.* 14:1).

#### 2.  Innova's Proposed Construction

Innova first argues that "reading" should be construed as "a numerical value of the selected parameters." (Claim Constr. Summ. Br. 14:16–17).  In support of that argument, it explains that the '899 Patent distinguishes between the display device and signal lamps, the former being used to display a numerical value. (*Id.* 14:20–24 (citing '899 Patent 2:42–45, 10:40–47 (describing numerical display of voltage), 6:1–6 (describing display of continuity using signal lamps))).  Innova further asserts that both parties' experts agree that the "reading"

must be a numerical value. (Claim Constr. Summ. Br. 15:3–9 (citing Tutorial Hr'g Tr. 31:1–3, 54:3–9)).

Innova next contends that the phrase "the parameter" must be construed as "the selected parameter" to avoid impermissible ambiguity. (*Markman* Hr'g Tr. 109:11–16). Specifically, Innova compares term 6 with term 8; term 6 states that the output signal is "representative of *at least one* of the parameters," while term 10 states that the reading is "representative of *the parameter*." ('899 Patent 11:42-43, 11:47 (emphasis added)). Because the output signal may represent multiple parameters, Innova asserts that term 8's reference to "the parameter" is vague.

### 3. *The Court's Claim Construction*

The Court addresses each disputed word within this term in turn. While the parties do not explicitly dispute the meaning of the phrase "display device" within term 7, PowerProbe's construction construes "display device" as a "screen." The Court declines to adopt such a construction. While the '899 Patent states that the "display device" "*may be* configured as a liquid crystal display," it does not explicitly limit "display device" to a screen. ('899 Patent 8:54–55 (emphasis added)). Adopting this portion of PowerProbe's construction would be tantamount to limiting the claim term to one of the '899 Patent's preferred embodiments, and thus the Court declines to do so. *See GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).

#### i. *"Reading"*

The Court finds that this term needs no construction. "Reading" is not the kind of technical term that requires further explanation before it can be understood by a jury, especially where term 8 further defines the "reading" as a "representat[ion] of the parameter." *See Terlep*, 418 F.3d at 1382. Thus, the question before the Court is whether Innova has supplied sufficient intrinsic evidence to warrant narrowing the plain and ordinary meaning of "reading" to a

"numerical value." Absent a clear disavowal in the specification or prosecution history, the patentee is entitled to the full scope of its claim language. *Home Diagnostics*, 381 F.3d at 1358. The '899 Patent never explicitly requires that the "reading" be a "numerical value." While Innova points to several portions of the specification in support of its argument, the Court finds no clear disavowal of claim scope in those citations. While one cited portion of the specification describes a "reading" of voltage as a numerical value, (*see* '899 Patent 10:40–47), that section is exemplary; just because measurement of *one* parameter results in a "reading" consisting of a numerical value does not mean that *every* reading must be a numerical value.[10]

The Court concludes that the claim language here speaks for itself. All that these terms require is that the "reading" represent the parameter being measured; an additional requirement that the "reading" be a numerical value would read a limitation from the specification into the claims. *See Phillips*, 415 F.3d at 1323.

*ii.*     *"The parameter"*

The Court agrees with Innova that further construction of "the parameter" as "the selected parameter" is warranted here. Term 6 states that the output signal is "representative of at least one of the parameters," meaning that the output signal can be representative of *multiple* parameters. Thus, it is not completely clear which one of those parameters the words "the parameter" in term 8 refer to. Claim construction must be conducted with an eye towards making the claims understandable to a jury—an inconsistency like this could create real confusion at trial. Further, construing "the parameter" as "the selected parameter" is consistent with the language of claim 1. The preamble of claim 1 makes clear that the electrical test device is configured for "*selective* measurement of a plurality of parameters." ('899 Patent 11:31–32). When reading the claim as a whole, it would be apparent to a POSITA that the

---

[10] Innova's citation to col. 2, ll. 40–47 of the '899 Patent is also unavailing, as that portion of the specification merely restates the claim language.

reading expected by a user would be one which represents the parameter that the user has

selected for measurement. Accordingly, the Court finds that no construction of "display device"

and "reading" is necessary, and construes "the parameter" as "the selected parameter."

**I. Term 9: "a keypad configured to allow for switching between measurement modes of the parameters"**

**Proposed Constructions**

| | |
|---|---|
| **PowerProbe** | No construction necessary.<br>• "keypad" means "any number of keys, buttons, or switches used for controlling the functionality of the electrical test device."[11]<br>• "measurement modes" means "modes of measurement including but not limited to switching between the active and passive mode, or between measuring different parameters." |
| **Innova** | "A set of keys or buttons configured for manual selection among different types of parameter measurements." |

This term appears in Claims 9 and 20. Again, there are two core disputes between the

parties regarding this term: the construction of "keypad," and the construction of "measurement

modes." The remaining words in this term require no construction. The plain and ordinary

meaning of "switching between" would be apparent to a POSITA and does not require

additional construction for the jury to understand it. *See Terlep*, 418 F.3d at 1382. Further, the

Court sees no reason to duplicate its construction of "parameter" in this term because it

construed "parameter" separately in term 3. (*See* Section (V)(C)(3)(iii)).

**1. PowerProbe's Proposed Construction**

First, PowerProbe argues that "keypad" should be construed as "any number of keys,

buttons, or switches." (*Markman* Hr'g Tr. 126:19–20). It points to the specification, which

---

[11] PowerProbe's proposed construction of "keypad" is taken from their statements at the *Markman* Hearing. (*Markman* Hr'g Tr. 126:19–20). While they further a proposed construction of "switch" in their Opening Claim Construction Brief, this construction reflects their most recent position. (*See* Op. Br. 16:24).

states that the keypad "may be comprised of any number of keys," thus including a "keypad"
that features *one* key. (Op. Br. 17:5–9 (citing '899 Patent 8:64–67)).  PowerProbe asserts that
Innova's construction, which requires "multiple keys," would contradict the intrinsic record.
(*Markman* Hr'g Tr. 122:17–24).  Moreover, PowerProbe contends that one of the preferred
embodiments of the '899 Patent features a single button and would thus be impermissibly
excluded by Innova's proposed construction. (*Compare* '899 Patent, Fig. 2 ('84' drawn to three
buttons), *with* Fig. 4 ('84' drawn to only one button)).  Finally, PowerProbe points to U.S.
Patent 5,367,250 ("'250 Patent"), which the '899 Patent incorporates by reference. (*Markman*
Hr'g Tr. 124:18–20 (citing '899 Patent 5:40–45)).  Specifically, PowerProbe avers that the '250
Patent teaches a single "switch" that accomplishes the same features as the "keypad" in the
'899 Patent. (*Id.* 125:17–20).

Second, PowerProbe argues that "measurement modes" should be construed to include
"at least" the "active mode," where the electrical test device supplies power to the electrical
system, the "passive mode," where the electrical test device does not supply power to the
electrical system, and the measurement of different parameters. (*Markman* Hr'g Tr. 133:14–
19).  In support of this argument, PowerProbe contends that the '899 Patent consistently
describes the keypad as controlling the active and passive modes. (Op. Br. 17:16–20 (citing
'899 Patent 2:47–57, 4:65–67)).  Further, PowerProbe asserts that the word "mode" appears
"almost exclusively" in the '899 Patent in the context of the active and passive modes, and that
any construction excluding the active and passive modes from "measurement modes" would
eliminate a preferred embodiment of the '899 Patent. (*Markman* Hr'g Tr. 133:6–16).

### 2. *Innova's Proposed Construction*

First, Innova argues that "keypad" should be construed as "a set of keys or buttons," in
line with its plain and ordinary meaning. (Claim Constr. Summ. Br. 16:2–3 (citing Keypad
Definition, *Collins Dictionary* (defining "keypad" as a "set of keys or push buttons."))).  Innova

1   maintains that "keypad" must be construed "to cover all the functions" of the electrical test

2   device, and asserts that a *single* key, button, or switch would be insufficient to perform both the

3   selective measurement and selective powering functions included in Claim 1; to perform both

4   functions, "at least two" keys or buttons would be required. (*Markman* Hr'g Tr. 128:9–18,

5   131:7–12).

6        Second, Innova argues that the term "measurement modes" should be limited to

7   measuring different parameters. (Claim Constr. Summ. Br. 16:5–6).  The '899 Patent, Innova

8   asserts, only ever uses measurement modes to refer to measuring different parameters. (*Id.*

9   16:5–9 (citing '899 Patent 9:8–14)).  Finally, Innova contends that PowerProbe's proposed

10  construction is impermissibly vague, specifically identifying its use of the phrase "including but

11  not limited to." (*Id.* 16:19–24 (citing *Nautilus*, 572 U.S. at 909–10)); (*Markman* Hr'g Tr.

12  136:4–8).

13            ### 3.  *The Court's Claim Construction*

14       For the reasons discussed below, the Court adopts PowerProbe's construction of

15  "keypad," in part, and Innova's construction of "measurement modes."

16            *i.    "Keypad"*

17       The Court finds that a POSITA would understand the plain and ordinary meaning of

18  "keypad" within the context of the '899 Patent to be "any number of keys or buttons."  This

19  construction is clear from the specification. (*see* '899 Patent 8:64–65).  Further, the

20  specification describes a preferred embodiment of the electrical test device which has "three

21  buttons." ('899 Patent 8:64–67).  Because it would be error to adopt a construction of "keypad"

22  which excludes a preferred embodiment, the Court agrees that the construction of this term

23  must also include "any number of buttons." *See On-Line Tech., Inc. v. Bodenseewerk Perkin-*

24  *Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004).

25

1    However, the Court declines to construe "keypad" as including a "switch" or "any

2    number of switches."  PowerProbe supports this portion of their construction solely by

3    referencing the '250 Patent, which discloses a single switch. ('250 Patent 6:61–68).

4    PowerProbe contends that the '250 Patent accomplishes the same features as the "keypad" of

5    the '899 Patent. (*Markman* Hr'g Tr. 125:17–20).  The '899 Patent incorporated the '250 Patent

6    "in its entirety," ('899 Patent 5:40–45), rendering the '899 Patent a part of the intrinsic record.

7    *See Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1045 (Fed. Cir. 2000).  But while

8    the '899 Patent's "keypad" and the '250 Patent's "switch" are analogous in that they are used to

9    control the operation of their respective devices, one does not shed light on the meaning of the

10   other.  In *Arthur A. Collins*, the disputed term at issue was previously "described and claimed

11   in" the prior art. 216 F.3d at 1045 (considering how the term "TST switch" was used in the

12   prior art to construe the same term as it appeared in the patent before the court).  Here, the term

13   "keypad" appears nowhere in the '250 Patent; likewise, the term "switch" as used in the '250

14   Patent appears nowhere in the '899 Patent.  PowerProbe seeks to import "switch" into the

15   definition of "keypad" in a way that plainly contradicts the '899 Patent, and this Court thus

16   declines to adopt that portion of PowerProbe's construction.

                    ii.    *"Measurement modes"*

17

18   The Court begins with the language of Claim 9, which states that the keypad is

19   "configured to allow for switching between measurement modes *of the parameters*." ('899

20   Patent 12:19–20).  The specification also discusses measurement modes in relation to the

21   measurement of different parameters; after describing several different parameters that the

22   electrical test device may measure, the specification refers to "further measurement modes."

23   ('899 Patent 9:8–13).  Indeed, neither the specification nor the claims equate "measurement

24   modes" with the active and passive mode. (*See, e.g.*, '899 Patent 4:54–57, 9:53–56, 11:54–59

25   (describing the active and passive modes with no mention of the term "measurement modes")).

PowerProbe is correct that the '899 Patent describes switching between the active and passive modes as controlled by the keypad. (*See, e.g.*, *id.* 2:54–56, 4:65–67). Without more, however, construing "measurement modes" to include the active and passive modes would be tantamount to reading a limitation from the specification into the claims. *See Phillips*, 415 F.3d at 1323.

Moreover, PowerProbe's argument that declining to include the "active mode" and "passive mode" within the construction of "measurement modes" would exclude a preferred embodiment of the invention is unavailing. (*Markman* Hr'g Tr. 133:6–16). While this Court's construction may exclude the "active and passive modes" from Claim 9, "this does not mean that [the embodiment is] excluded from the scope of the invention, but rather that [it is] excluded from the scope" of Claim 9. *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008). Indeed, Claim 2 recites the functionality of the electrical test device relating to the "active and passive modes." (*See* '899 Patent 11:52–58).

Thus, the Court construes "keypad" as "any number of keys or buttons," and "measurement modes" as "different types of parameter measurements."

## J. Term 17: "continuity measurement"

### Proposed Constructions

| PowerProbe | No construction necessary. "Determining a measured value associated with circuit continuity." |
|---|---|
| Innova | "Determining a numerical value associated with continuity."[12] |

This term appears in Claims 10, 12, and 24. Much of Innova's argument on this term casts the Claims in which it appears as indefinite due to the '899 Patent's failure to disclose "a method for measuring continuity as a quantifiable parameter." (Claim Constr. Summ. Br.

---

[12] This construction of "continuity measurement" was supplied by Innova in the initial round of claim construction. (Resp. Br. 22:9–11). At the more recent *Markman* Hearing and in its Claim Construction Summation Brief, Innova provides no proposed construction, but instead argues that the term renders Claims 10 and 12 indefinite. (*Markman* Hr'g Tr. 143:15–17); (Claim Constr. Summ. Br. 18:2–19:26).

18:11–14).  However, as explained above, (*see* Section (V)(C)(3)(ii)), this Court declined to construe "measurement" in a way that requires a numerical or quantitative value.  Thus, this Court will analyze Innova's indefiniteness arguments in view of the Court's chosen construction of "measurement" as "an amount or degree of something."

### 1.   *PowerProbe's Proposed Construction*

PowerProbe argues that, consistent with the Federal Circuit's mandate, "continuity must be construed as measurable." (*Markman* Hr'g Tr. 148:8–9).  It asserts that the '899 Patent itself describes continuity as measurable. (Op. Br. 21:15–18 (citing '899 Patent 12:21–24)); (*see also* '899 Patent, 4:48, 8:37–39, 9:9–11, 12:51–54 (Claim 12)).  PowerProbe explains that the correct construction of this term is "the Court's ultimate [construction] of measurement merely applied to continuity." (*Markman* Hr'g Tr. 151:11–13).

### 2.   *Innova's Proposed Construction*

Innova's argues that because the '899 Patent does not teach a method of measuring continuity as a quantifiable parameter, a construction of continuity as measurable would render Claims 10 and 12 ambiguous, and thus invalid. (Claim Constr. Summ. Br. 18:11–18).  Innova contends that PowerProbe seeks to use "knowledge of one skilled in the art" to fill this gap, which is impermissible. (*Id.* 18:6–10 (citing *Brita LP v. Int'l Trade Comm'n*, No. 2024-1098, --- F.4th ---, 2025 WL 2922550, at *10 (Fed. Cir. Oct. 15, 2025)).  Further, Innova asserts that Claims 10 and 12 "raise indefiniteness concerns" because they fail to delineate a clear boundary between detecting and measuring continuity. (Claim Constr. Summ. Br. 18:19–22 (citing *Nautilus*, 572 U.S. at 910)).  Specifically, Innova avers that if continuity is not quantifiable, the limitations in Claims 10 and 12 "are not meaningfully distinct from the 'detecting continuity' limitation in [Claim] 3." (Claim Constr. Summ. Br. 18:19–23).

Moreover, Innova argues that this ambiguity is compounded by an admission from PowerProbe's expert that there exists in the art "different definitions of continuity and different

1  techniques of testing for continuity." (*Id.* 19:3–8 (citing Barden Depo Tr. 34:6–9, Ex. B to

2  Claim Constr. Summ. Br., ECF No. 288-2)).  Finally, Innova points to the IEEE definition of

3  "continuity test" as a procedure for "detecting broken or open connections." (Claim Constr.

4  Summ. Br. 19:22–26 (citing Continuity Test, *The Authoritative Dictionary of IEEE Standards*

5  *Terms* (7th ed. 2000))).  Thus, Innova contends, continuity should be understood "as a

6  detectable, *not measurable*, condition." (Claim Constr. Summ. Br. 19:24–26 (emphasis added)).

### 3.  The Court's Claim Construction

8          The Court first notes that many of Innova's arguments are inapplicable where

9  "measurement" is construed as "an amount or degree of something."  While Innova argues that

10 Claims 10 and 12 are indefinite because the '899 Patent fails to teach a method of measuring

11 continuity as a *quantifiable parameter*, under this Court's construction of measurement, no

12 quantification is required. (*See* Section (V)(C)(3)(ii)).  Innova's argument that Claims 10 and

13 12 are indefinite because they "are not meaningfully distinct from the 'detecting continuity'

14 limitation" in Claim 3 is also unpersuasive.  As the Federal Circuit recognized, "detecting

15 continuity and measuring continuity are [not] mutually exclusive" in the context of the '899

16 Patent. (Fed. Cir. Op. at 6).  To the extent that Innova furthers a claim differentiation argument,

17 that too is misplaced.  First, claim differentiation applies with most force in the context of a

18 comparison between an independent claim and its dependent claim. *Acumed LLC v. Stryker*

19 *Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007).  Here, Claims 10, 12 and 3 all depend on Claim 1.

20 ('899 Patent 11:59, 12:21, 12:51).  Second, the doctrine of claim differentiation "states that

21 claims should be *presumed* to cover different inventions," but "claim differentiation is a guide,

22 not a rigid rule." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991).  "If a

23 claim will bear only one interpretation, similarity will have to be tolerated." *Id.*  Here, as the

24 Federal Circuit recognized, "continuity must be construed as measurable." (Fed. Cir. Op. at 7).

25

Finally, the Court declines to consider the IEEE definition offered by Innova, as it directly conflicts with the '899 Patent and the Federal Circuit's mandate.  Thus, the Court agrees with PowerProbe, and construes "continuity measurement" as "determining an amount or degree of circuit continuity."

## VI.    **CONCLUSION**

**IT IS HEREBY ORDERED** that the Court construes all claim terms submitted by the parties in U.S. Patent 7,184,899 as follows:

| Claim Term | Construction |
|---|---|
| "an electrical test device having multimeter functionality" | "an electrical test device having the ability to measure parameters of an electrical system." |
| "provide current sourcing" | "supply current" |
| "selective measurement of a plurality of parameters thereof" | "user-selected measurement of two or more parameters of the electrical system," where "measurement" means "to determine an amount or degree of something" |
| "in at least one of powered and unpowered states" | "while the system under test is operational (powered) or the system under test is non-operational (unpowered)." |
| "input signal" | "electrical quantity such as a voltage or current that represents or conveys information." |
| "a processor electrically connected to . . . and configured to manipulate the input signal" | No construction necessary. Processor means "portion of the electrical test device that controls all the functions of the electrical test device." |
| "receive an output signal in response to the input signal" | Output signal means "an electrical signal received from the electrical system." |
| "the output signal being representative of at least one of the parameters of the electrical system" | No construction necessary. |
| "a display device . . . configured to display a reading of the output signal" | No construction necessary. |
| "the reading being representative of the parameter" | No construction necessary. "The parameter" means "the selected parameter." |
| "configured to allow for selective powering of the electrical system" | No construction necessary. "Selective powering" means "user-selected powering." |

| "energization of the probe element during measurement of the parameters" | No construction necessary. |
|---|---|
| "measurement of the parameters during powering of the electrical system" | No construction necessary. |
| "measurement of the parameters without powering of the electrical system" | No construction necessary. |
| "wherein the parameters measurable" | No construction necessary. |
| "continuity measurement" | "determining an amount or degree of circuit continuity." |

**IT IS FURTHER ORDERED** that this case shall be referred to Magistrate Judge Elayna J. Youchah for the setting of the Post-Claim Construction Order Settlement Conference pursuant to Local Patent Rule 1-19(a).

**IT IS SO ORDERED.**

**DATED** this __19__ day of December, 2025.

_____
Gloria M. Navarro, District Judge
United States District Court